[Crim. No. 1095. Second Appellate District, Division One.—August 24, 1925.]

THE PEOPLE, Respondent, v. CHANNING FOLLETTE, Appellant.

[1] CRIMINAL LAW — SUCCESSIVE INDICTMENTS — PROVINCE OF GRAND JURY—DOUBLE JEOPARDY.—A grand jury may find a valid indictment notwithstanding another indictment is pending against the accused for the same offense, and the pendency of the other indictment, where there has been no conviction or jeopardy thereon, is not ground for a plea either in abatement or in bar of

---

1. Successive indictments, note, Ann. Cas. 1913D, 1095. See, also, 7 Cal. Jur. 947; 14 Cal. Jur. 19; 14 R. C. L. 160.

the second indictment, although the accused can be tried or put in jeopardy only on one.

[2] ID.—ABSENCE OF DEMURRER—AMENDMENT OF INDICTMENT—ORDER OF COURT UNNECESSARY.—The rule that neither the district attorney nor the grand jury can present an amended or second indictment, where a demurrer has been sustained to the original indictment, without obtaining an order of court either permitting the indictment to be amended or submitting the case to the same or another grand jury, is not applicable where no demurrer has been sustained to the original indictment, but the district attorney has the grand jury return a second indictment while the original indictment is in full force and after the defendant has entered his plea thereto.

[3] ID.—SECOND INDICTMENT—RELIANCE UPON ORIGINAL EVIDENCE.— When a second indictment is returned by the same grand jury which found the original one, the grand jury may rely upon the evidence given on the hearing which resulted in the return of the original indictment, and need not hear any additional evidence.

[4] ID. — PERJURY — CONTENTS OF INDICTMENT — INCLUSION OF MORE THAN ONE OFFENSE.—It is proper to include in an indictment for perjury all the material testimony of the accused which it is claimed is false; and where the testimony charged to be perjurious was all given in one proceeding before the grand jury, the fact that such testimony is quite lengthy will not render the indictment subject to demurrer on the ground that more than one offense is charged therein.

[5] ID.—SEVERAL ASSIGNMENTS—EVIDENCE.—While an indictment may embrace two, or more, or many assignments of perjury, if the evidence sustains one or more of the assignments it is not necessary for the prosecution to prove all of the charges.

[6] ID.—QUANTUM OF PROOF.—In prosecutions for perjury, the falsity of the statement claimed to be perjurious must be proven by two witnesses or the testimony of one witness and corroborating circumstances.

[7] ID.—POSITIVE EVIDENCE—FALSITY OF TESTIMONY.—Positive evidence is absolutely necessary to support a charge of perjury, and circumstantial evidence alone is never sufficient, but this does not

---

2.   See 14 Cal. Jur. 19.

3   See 14 R. C. L. 160.

4.   See 20 Cal. Jur. 1020.

6.   Quantum of proof in perjury cases, notes, 6 Ann. Cas. 812; 85 Am. Dec. 499. See, also, 20 Cal. Jur. 1023; 21 R. C. L. 272.

7.   Establishment of falsity of testimony by circumstantial evidence, note, 44 L. R. A. (N. S.) 513. May conviction of perjury rest upon circumstantial evidence, notes, 15 A. L. R. 634; 27 A. L. R. 857. See, also, 20 Cal. Jur. 1024.

mean that there must be the positive and direct evidence of a witness who has testified to the falsity of the testimony given by the accused.

[8] ID.—ISSUES—EVIDENCE—CORROBORATION—VERDICT.—In a prosecution for perjury based upon the alleged false testimony of defendant before the grand jury that he was not the person who had left certain bribe money at a specified drugstore, the rule requiring positive evidence does not mean that, in order to sustain a verdict of conviction, that at least one person must testify that he actually saw and identified defendant as the person who did leave the money at the drugstore, but such conviction must stand if there is any testimony showing a contrary state of facts from that sworn to by defendant before the grand jury and incompatible with his evidence there given, provided the same is legally corroborated.

[9] ID.—EXPERT TESTIMONY—IDENTIFICATION OF DEFENDANT.—In such prosecution for perjury, no distinction is to be made between expert testimony and other evidence as to its weight or preference; and the testimony of two attendants at the drugstore with whom the money was left that the person who left the package containing the money was a man of "medium build," and that he wrote the names of certain persons on the card left with the package, and the testimony of a handwriting expert that the writing on the card was that of defendant, is positive evidence tending to prove that defendant left the money at the drugstore, and it is absolutely inconsistent with defendant's sworn testimony before the grand jury that he did not do so, and is consequently incompatible with his innocence of the charge against him; and this testimony, if believed by the jury without any inference or presumption, conclusively proves the fact that defendant was the person who left the money.

[10] ID.—CORROBORATION REQUIRED.—The corroboration required under section 1103a of the Penal Code is the same as that required under section 1111, regarding the testimony of an accomplice; and the requirements of the statute are fulfilled if there be any corroborating evidence which, of itself, tends to connect the accused with the commission of the offense.

[11] ID.—TWO INDICTMENTS—JOINT TRIAL—SINGLE VERDICT.—Where two indictments were found against defendant, in the first of which only a small part of the alleged perjured testimony before the grand jury was set forth, whereas the second indictment, which was found shortly prior to the time set for .the trial on the first indictment, set forth a larger portion of the alleged perjured testimony, including all that set forth in the prior indictment, and by order of the court the two actions were con-

8.   See 20 Cal. Jur. 1024.

solidated and defendant was placed on trial on both indictments, and thereafter, without objection and without any request that the jury be instructed to bring in separate verdicts, the case is tried as one action, and the instructions all refer to "the indictment," and the jury renders its verdict finding "the defendant guilty of perjury as charged in the indictment," and the verdict bears the number assigned to the action upon the second indictment, such verdict may well be treated as a general verdict finding defendant guilty as charged of the crime for which he was placed upon trial in the actions as consolidated; but even if the jury had plainly indicated that their verdict only applied to the second indictment, they would thereby have found defendant guilty of all charges contained in the first indictment.

[12] ID.—VERDICT—IMPLIED ACQUITTAL.—In such prosecution, conceding that there were two distinct and separate indictments upon which defendant was placed on trial, and that the jury's verdict only applied to the second indictment, the failure of the jury to render a verdict upon the first indictment did not acquit defendant of those assignments of perjury contained in the second indictment which were also contained in the first indictment.

[13] ID.—OTHER CRIMES—EVIDENCE.—While the general rule is that evidence which tends to show that the accused is guilty of the commission of crimes other than that for which he is then on trial is inadmissible against him, one of the exceptions to that rule is that where the evidence, to which objection has been made, although it shows defendant guilty of other crimes, tends directly to prove the crime for which he is then being tried, such evidence is admissible against him on said trial.

[14] ID.—PERJURY—CONSPIRACY—EVIDENCE—MOTIVE.—In this prosecution for perjury based upon the alleged false testimony of defendant before the grand jury that he was not the person who had left certain bribe money at a specified drugstore, the trial court did not commit error in overruling defendant's objection to the admission of evidence of a conspiracy between defendant and another person involving the forging and uttering of certain bail bonds, where such evidence had a tendency to show a motive on the part of defendant for furnishing the funds with which the officer was to be bribed and thus would be material as tending to prove that the money was furnished by defendant, which went to the very gist of the charge that defendant's statement before the grand jury that he did not leave it there was false.

[15] ID.—ACQUITTAL UPON PRIOR CHARGES—EVIDENCE IN SUBSEQUENT TRIAL—ESTOPPEL.—The mere fact that defendant and said other person had been charged with uttering said forged bail bonds, and that defendant had been acquitted of such charge, did not

---

13.  See 8 Cal. Jur. 71.

render evidence of such other crime inadmissible against defend-
ant in the subsequent action against him on the perjury charge;
and while the record of said former action, showing the acquittal,
would have been admissible as matter of defense, to weaken the
case of the prosecution, the trial court did not commit error in
denying defendant's offer to prove the same, where such offer
was made during the introduction of evidence by the prosecution,
and then only to prove an estoppel and thereby prevent the prose-
cution from proving defendant's connection with said forged bonds.

[16] ID.—IMPEACHMENT OF OWN WITNESS—ABSENCE OF ADVERSE TES-
TIMONY—ERROR WITHOUT PREJUDICE.—In a criminal case, where
a witness called by the prosecution does not give adverse testi-
mony, but merely states that he does not remember, it is error
to permit the prosecution to show the previous statements by said
witness before the grand jury; but the error in permitting the
prosecution to cross-examine said witness, by reading to him por-
tions of his testimony before the grand jury, will not justify the
appellate court in reversing the judgment of conviction where
the other evidence in the case is such that, eliminating this im-
proper evidence, it is highly improbable that the jury would have
rendered any other verdict than that of guilty.

[17] ID.—FALSE TESTIMONY—CORROBORATION—INSTRUCTIONS.—In this
prosecution for perjury, conceding that one of the instructions
given by the court on the subject of corroboration assumed that
defendant made the false statements with which he was charged,
the jury were not misled thereby, where they were repeatedly told
by the court in other instructions that defendant could not be
convicted of perjury unless the statements charged to be false
were proven so beyond a reasonable doubt by the testimony of
two witnesses, or of one witness and corroborating circumstances.

[18] ID.—DEFINITION OF CORROBORATION—INSTRUCTIONS.—In a prose-
cution for perjury, it is not error to instruct the jury that "to
corroborate means to strengthen, to make more certain, to add
weight or credibility to a thing, to confirm by additional security,
to add strength," where such instruction continues with the sen-
tence that "It does not mean facts which independent of the evi-
dence being corroborated, will warrant a conviction, but it is
evidence which tends to prove the defendant's guilt, independent
of the evidence which is corroborated."

[19] ID.—INTENT—CORRUPT AND WILFUL FALSE TESTIMONY—INSTRUC-
TIONS.—In a prosecution for perjury, it is not error to instruct
the jury in the language of section 125 of the Penal Code, where
the court, in another instruction given, tells the jury that "The
false testimony must have been corrupt and wilful, and ignorance
of the true facts, inadvertence, or mistake, are not substitutes
for wilfulness or corruptness.

---

18.   See 8 *Cal. Jur.* 295.

○

[20] ID.—APPROVAL OF BAIL BONDS—JURISDICTION OF MAGISTRATE—ERRONEOUS INSTRUCTION.—In this prosecution for perjury, defendant's requested instruction that "You are instructed that a magistrate, in approving bail bonds, has a legal right to assume that the persons qualifying thereon are in truth and in fact the persons whom they purport and claim to be, when they appear before such magistrate to justify," could only have confused the jury, and was not a correct statement of the law on the subject, and was properly refused.

[21] ID.—ACCEPTING BAIL—DUTY OF MAGISTRATE.—It is the duty of a magistrate, in accepting bail, to the very limit of his knowledge and in the exercise of the greatest care, to see that the bail bond he accepts is legal in form, that the sureties whose names are signed thereto are the persons they purport to be, and that they are able to respond to the full extent of the penalty thereof in case the principal fails to comply with the conditions of said bond.

[22] ID.—JUSTIFICATION OF BAIL—DISCHARGE OF DEFENDANT—JURISDICTION OF MAGISTRATE—LOCAL CUSTOM—EVIDENCE—INSTRUCTIONS. The magistrate admitting the defendant to bail is the only one before whom the bail may justify, and the only magistrate authorized to make and sign the defendant's discharge upon the allowance of bail and the execution of the undertaking; and error may not be predicated upon the refusal of the trial court to instruct the jury, at defendant's request, that "Any committing magistrate may accept bail or approve bail bonds whether the person admitted to bail was so admitted by such committing magistrate or by any other committing magistrate," where defendant is not only permitted to prove that it was the practice of township justices in that county for any one of them to approve bail bonds, notwithstanding the fact that the justice approving the bond was not the committing magistrate in the proceeding in which the bond was given, and the court instructs the jury that if they should find that such a practice existed, they might take that into consideration as going to the matter of intent of defendant in approving bonds in actions in which he was not the committing magistrate.

---

(1) 31 C. J., p. 598, n. 13.   (2) 31 C. J., p. 600, n. 62.   (3) 31 C. J., p. 601, n. 69.   (4) 30 Cyc., p. 1439, n. 87.   (5) 30 Cyc., p. 1452, n. 87.   (6) 30 Cyc., p. 1452, n. 92.   (7) 30 Cyc., p. 1453, n. 93.   (8) 30 Cyc., p. 1453, n. 94.   (9) 16 C. J., p. 756, n. 25; 30 Cyc., p. 1454, n. 2.   (10) 30 Cyc., p. 1454, n. 2.   (11) 6 C. J., p. 1108, n. 40.   (12) 16 C. J., p. 1107, n. 32.   (13) 16 C. J., p. 588, n. 8.   (14) 16 C. J., p. 608, n. 89.   (15) 16 C. J., p. 592, n. 51.   (16) 17 C. J., p. 321, n. 45; 40 Cyc., p. 2691, n. 99.   (17) 16 C. J., p. 1053, n. 93.   (18) 30 Cyc., p. 1458, n. 35.   (19) 16 C. J., p. 1053, n. 93.   (20) 16 C. J., p. 1066, n. 89.   (21) 6 C. J., p. 971, n. 84.   (22) 6 C. J., p. 976, n. 43.

APPEAL from a judgment of the Superior Court of Los Angeles County. Arthur Keetch, Judge. Affirmed.

The facts are stated in the opinion of the court.

Robert M. Clarke, Paul W. Schenck, H. L. Giesler and Leon R. Yankwich for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman and Erwin S. Widney, Deputies Attorney-General, for Respondent.

CURTIS, J.—An indictment against the appellant was returned by the grand jury of the county of Los Angeles charging him with the crime of perjury. Certain testimony was set out in said indictment which it was alleged therein was given by the appellant, while testifying as a witness before said grand jury, and it was charged in said indictment that said testimony was false and untrue, and that appellant at the time he gave the same knew it to be false and untrue. Only a small portion of the testimony of appellant, given at the time he was before the grand jury, was set forth in this indictment. The appellant was arraigned upon said indictment and pleaded not guilty to the charge therein contained, and the action was set for trial. Thereafter, and some two weeks before the day of trial, the same grand jury, without calling any additional witnesses, or without taking any further testimony whatever, and without any leave or order of court either permitting any amendment to said indictment, or directing the filing of a new indictment, or directing the case to be resubmitted to the same or another grand jury, returned a second indictment against appellant, again charging him with the crime of perjury. In this new indictment, not only was the testimony which was contained in the original indictment, and which was therein made the basis of the charge of perjury against the defendant, set forth, but other and further testimony, alleged therein to have been given by appellant while testifying as such witness before said grand jury, was set out in said new indictment, and the whole thereof was in said new indictment charged to be false and untrue, and to have been made by appellant with knowledge of its falsity and untruthful-

ness. A motion was made to set aside this new indictment upon all the statutory grounds. This motion was denied.

The first point made by appellant for a reversal of the judgment herein is based upon the refusal of the court to grant his said motion to set aside said second indictment. The principal ground urged by appellant in support of said motion, and the only one which we will consider upon this appeal, was that said second indictment was not legally found by the grand jury for the reasons: First, that said grand jury was without jurisdiction or power to consider the matter without an order of resubmission, and secondly, that said grand jury was without authority to find said new indictment without hearing further and additional testimony to that presented to them at the original hearing.

[1] As to the power of the grand jury to return a second indictment against a defendant for the same offense charged in the first, the rule is stated in Corpus Juris as follows: "It is generally held that a grand jury may find a valid indictment notwithstanding another indictment is pending against accused for the same offense, and the pendency of the other indictment, where there has been no conviction or jeopardy thereon, is not ground for a plea either in abatement or in bar of the second indictment, . . . although as a rule accused can be tried or put in jeopardy only on one. It has been so held, even though defendant has been arraigned and a plea of not guilty entered on the first indictment." (31 C. J., p. 598.) Numerous authorities are cited by the author of the above work in support of this rule, and they appear generally to sustain the text. [2] Appellant has called our attention to a number of cases decided by the supreme and appellate courts of this state which hold in effect that neither can the district attorney file nor the grand jury present an amended or second indictment where a demurrer has been sustained to the original indictment without obtaining an order of court either permitting the indictment to be amended or submitting the case to the same or another grand jury. This is in accord with section 1008 of the Penal Code and is undoubtedly the rule enunciated in the following cases: *Ex parte Williams,* 116 Cal. 512 [48 Pac. 499]; *Copeland* v. *Superior Court,* 62 Cal. App. 316 [217 Pac. 573]; *Ex parte Hayter,* 16 Cal. App. 211 [116 Pac. 370]. These cases are not decisive of the point now under

consideration, for the reason that no demurrer was sustained to the original indictment returned herein against the defendant, but the district attorney, for reasons best known to himself, had the grand jury return a second indictment while the original indictment was in full force and after the defendant had entered his plea thereto.

The case of *Thompson* v. *United States*, 202 Fed. 401 [47 L. R. A. (N. S.) 206, 120 C. C. A. 575], is a case very similar to the present action. This case arose in this state, but was brought in the federal courts and the decision rendered by the circuit court of appeals was made in reference to the practice established by our Penal Code in criminal actions. In that action a second indictment had been returned against the defendant in which he was accused of the identical crime embraced in the first indictment after he had entered his plea and the case had been set for trial. It does not appear that the court made any order permitting the district attorney to amend the indictment or directing the case to be resubmitted to the grand jury. The court said, page 403, ''The contention is that under the law of California, which it is said became the rule of practice for the federal courts in that state, a grand jury which has once indicted a defendant is disqualified to bring in a second indictment against him charging him with the same offense. . . . Counsel for plaintiff in error cite three decisions— *People* v. *Hanstead*, 135 Cal. 149 [67 Pac. 763]; *People* v. *Bright*, 157 Cal. 663 [109 Pac. 33]; *People* v. *Landis*, 139 Cal. 426 [73 Pac. 153]. . . . It is to be observed that all of the decisions of the Supreme Court of California above cited were rendered prior to the change in section 1008 of the Penal Code, which was made in 1905. . . . The section as amended substitutes for the last clause the following: 'Directs the case to be submitted to the same or another grand jury'—thereby declaring the law of the state to be that a grand jury which had once found an indictment against a defendant was not disqualified to find a second indictment against him upon the same facts, a wise provision of law, and we may well wonder why it should ever have been held otherwise, as no substantial reason is apparent why a grand jury after having once found an indictment which is discovered to be defective in form may not, upon the information which it has acquired, and with the same convic-

tion, based upon that information, that the defendant should be brought to trial, present a second indictment for the same offense.'' It may be true, as suggested by appellant, that the point made in that action in support of the motion to quash the indictment was that ''A grand jury which has once indicted a defendant is disqualified to bring a second indictment against him, charging him with the same offense,'' but the court, in deciding said motion adversely to the accused, must necessarily have held that the grand jury had a right to return the second indictment without any order of court directing a resubmission of the case, for the reason we think the record plainly shows that no such order was made by the trial court.

In *Kalloch* v. *Superior Court,* 56 Cal. 229, the defendant was prosecuted by information. After an order made setting aside the first information, a second information for the same offense was filed by the district attorney, without any order by the court directing the filing of the same. Prior to the making of said order of dismissal, however, a second complaint had been filed against the defendant, charging him with the same crime set out in the first information. The defendant moved to set aside the second information and his motion was denied. The defendant then instituted a proceeding to prohibit the superior court from proceeding with the trial of the defendant on the ground that all proceedings under the second information were absolutely void and the court was without jurisdiction of the defendant. In denying this petition, the supreme court, on page 236, disposes of this question as follows: ''But was it a material fact in the case, that the second prosecution was commenced before the first one was ended? Suppose the prosecution had been by indictment, would the pendency of the indictment affect the right of the prosecution to present another for the same offense? This question is answered in the negative by a multitude of authorities, a few of which we will notice. In the case of *Dutton* v. *State,* 5 Ind. 534, it was held, that 'another indictment pending for the same offense constitutes no ground of abatement. This, in criminal prosecutions, seems to be the settled rule.' (1 Chitty's Crim. L. 447.) In the case of *Commonwealth* v. *Murphy,* 11 Cush. (Mass.) 472, the court says that 'the pendency of one indictment is no ground for plea in abatement to another

indictment in the same court for the same cause.' In the case of *Miazza* v. *State*, 36 Miss. 616, the court decided, that 'the motion in arrest of judgment, on the ground that other indictments of similar import were then pending in the same court against the same defendant, was properly overruled.' In *United States* v. *Herbert*, 5 Cranch C. C. 87, Chief Justice Cranch said, that 'the pendency of another indictment against the defendant for the same offense is no ground for arresting the judgment.' The last authority to which we will refer on this subject is Wharton's Criminal Pleading and Practice, section 452, where the author says: 'It has been ruled that, though the defendant has pleaded to a former indictment for the same offense, the fact of the former indictment being still pending is no bar to a trial on the second.' It is true, that all the foregoing cases refer to indictments, but the rule is equally applicable to an information, as the latter is simply designed to serve the purpose and take the place of the former. Each is but an accusation, in legal form, of the offense with which the prisoner stands charged, and for which he is to be placed upon trial. We can, therefore, see nothing in the provisions of the Penal Code, or in the general principles of law, applicable to proceedings in criminal cases, which in any manner affect the regularity and validity of the second information, on the ground above stated.''

In *People* v. *Ammerman,* 118 Cal. 23 [50 Pac. 15], the court had under consideration section 1008 of the Penal Code. In that case the information had been filed charging the defendant with the crime of robbery. The defendant pleaded not guilty to the charge and his case was set for trial. After the jury had been sworn to try the case, the district attorney discovered that the information was fatally defective in that it failed to allege the ownership of the property stolen. Thereupon, and upon his motion, the court dismissed the information and discharged the defendant, without making any order that a new information be filed. The district attorney, nevertheless, thereafter filed a new information charging the defendant with the same crime which had been attempted to be charged in the original information. It was claimed by the appellant therein that under section 1008 of the Penal Code the prosecution was barred because of the failure of the court to direct the filing

of a new information. The supreme court, however, held that section 1008 was applicable only when a demurrer had been filed to the information and had been allowed by the court. The court on page 28 disposed of appellant's contention as follows: "The question in my opinion does not necessarily arise, for the reason that no demurrer to the information appears to have been filed. It is by the terms of the statute in the case of demurrer allowed that the judgment becomes a bar unless the court directs a new information to be filed. The section does not apply to a case where no demurrer is interposed, or, if interposed, is disallowed. This clearly appears from preceding and subsequent sections of the same chapter." We can conceive of no reason why any different rule should prevail in the case where the accused is being prosecuted by an indictment instead of by an information. There are a few cases in other jurisdictions holding a contrary doctrine, but these cases we think are exceptions to the general rule which permits the return of a second indictment without any order of court directing the case to be resubmitted.

Important changes have been made in recent years in the criminal procedure of our state, the evident purpose of which was to remove the restrictions which were formerly placed upon prosecuting officers in instituting and conducting criminal proceedings. In 1905 [Stats. 1905, p. 773], section 1008 was amended so as to permit a resubmission of the case to the same grand jury in the event of a demurrer thereto being sustained, and, in 1911 [Stats. 1911, p. 436], this section was further amended so as to permit an indictment or information to be amended by the district attorney without leave, before the defendant pleads, and by leave of court thereafter. The strict rules prevailing prior to these amendments often hampered prosecuting officers in their attempts to enforce the law and resulted in many miscarriages of justice. In view of the more liberal rules now prevailing in the institution and conduct of criminal proceedings, and after a consideration of the above authorities, we are of the opinion that there is nothing in the law of this state which affects the regularity or validity of the second indictment presented against the defendant.

[3] Neither do we think the court erred in denying appellant's motion to set aside the said indictment on the

ground that the grand jury failed to take further evidence before returning the same. The general rule appears to be that when the second indictment is returned by the same grand jury which found the original one, the grand jury may rely upon the evidence given on the hearing, which resulted in the return of the original indictment, and need not hear any additional testimony. (31 Cor. Jur., p. 600; *People* v. *Baff*, 99 Misc. Rep. 684 [166 N. Y. Supp. 136]; *Whiting* v. *State*, 48 Ohio, 220 [27 N. E. 96].) There are a few cases holding a contrary doctrine. Among these latter cases is that of *State* v. *Ivey*, 100 N. C. 539 [5 S. E. 407], and cited and relied upon by appellant. Regarding this case the court in *People* v. *Baff*, *supra*, says: "To sustain the point made in the first motion, counsel rely on the case of *State* v. *Ivey*, 100 N. C. 539 [5 S. E. 407], which supports their contention. I am, however, not inclined to follow that decision, for the reason that it is too technical. It seems to me that it would be an idle ceremony for the same grand jury to rehear the same witnesses, where it is of opinion that sufficient evidence was taken in the first proceeding to meet the objections which resulted in a demurrer being allowed to a defective indictment." To the same general effect is the case of *Whiting* v. *State*, *supra*.

[4] Appellant interposed a general and special demurrer to the second indictment which was overruled by the court. Appellant assigns this action of the court as reversible error. The principal contention of appellant in support of his demurrer is that more than one offense was charged in the indictment. The indictment in question consisted of one count, and covered nearly fifty typewritten pages of the clerk's transcript. It contained a large portion, although by no means all, of the testimony given by the appellant while testifying as a witness before the grand jury in an investigation then being made by said grand jury of an attempt to bribe a deputy sheriff of said county. The testimony charged to be perjurious was all given in one proceeding before the grand jury. Appellant contends that, under the practice followed by the district attorney in this action, it is impossible for the appellant, or for that matter for the court, to know of what particular false statement defendant was found guilty; that while all the jurors may have believed that he falsified in some material portion of his

testimony, they might wholly disagree as to the particular portion thereof which was false and untrue. Appellant further claims that each violation of his oath, if material, constituted a separate and distinct offense, and, under section 954 of the Penal Code, should be pleaded in separate counts. No authorities have been called to our attention which support this contention of appellant. On the other hand, there appears to be quite an agreement among text-writers and in the adjudicated cases that it is proper to include in an indictment all the material testimony which it is claimed is false. "An indictment or information charging perjury may join, in one count, all the particulars in which the accused is alleged to have testified falsely, although the assignments are in relation to separate and distinct false statements, where all the statements assigned as false were made under oath and in one proceeding." (Wharton's Criminal Procedure, vol. II, 3d ed., sec. 1069.) "An indictment for perjury may embrace in a single count all the particulars in which the defendant is alleged to have sworn falsely." (30 Cyc. of Law and Procedure, p. 1439; *Cover* v. *Commonwealth* (Pa.), 8 Atl. 196; *Commonwealth* v. *Johns,* 72 Mass. 274; *State* v. *Bishop* (1 D. Chipm. 120), 2 Vt. 118; *State* v. *Bordeaux,* 93 N. C. 560; *State* v. *Taylor,* 202 Mo. 1 [100 S. W. 41]; *State* v. *Joiner,* 128 La. 876 [55 South. 560].) The court in *State* v. *Taylor, supra,* said: "Some of the assignments of perjury were more clearly established than others, but there was ample testimony to establish the guilt of the defendant on a number of assignments, and on matters which were material to the issue on the trial of Kelleher, and where this is the case, it is proper to join the various assignments of perjury in one count where they relate to the same transaction, and, if the evidence sustains one or more of the assignments, it is not necessary that the state should prove all of the charges."

It is next the contention of appellant that the evidence is not sufficient to sustain the verdict. A consideration of this claim on the part of appellant will necessitate a statement of some of the facts as shown by the testimony. The verdict being against the defendant, it will be only necessary for us, in stating the facts, to mention those which tend to sustain the verdict. The appellant at the time of his indictment was, and for some two years prior thereto had

been, one of the six justices of the peace of the township of Los Angeles. On March 5, 1923, T. J. Gilbert and Sam Johnson, after a preliminary examination, were held to answer for the crime of grand larceny; their bail was fixed at $10,000 each, and, being unable to give the same, they were committed to the sheriff of the county of Los Angeles by Justice of the Peace W. S. Baird, before whom said preliminary examination had been held. While in jail these prisoners made the acquaintance of one Carl V. Lindquist, who was a fellow-prisoner with them in the county jail of said county. Lindquist had become acquainted with appellant some time during the preceding December. On April 17, 1923, Lindquist was released from jail. On the same day he visited appellant at his office and, according to his testimony, he arranged with appellant for the release of Gilbert and Johnson from said county jail, for the sum of $1,400, which amount was paid to appellant by Lindquist and Mrs. Gilbert, wife of T. J. Gilbert. On the evening of the day Lindquist was released he appeared at the county jail with two orders, signed by appellant, directing the release of Gilbert and Johnon. On May 1st Gilbert's case was called in the superior court, and upon his failure to appear his bond was forfeited. It was found on investigation that there was no bond on file for either Gilbert or Johnson. Later appellant produced two bonds which he had either at his residence or private law office, and which purported to have been given for the release of Gilbert and Johnson. These bonds bore the names of A. E. Stensbad and T. E. Little, but it later developed that the names of these purported sureties had been forged to the said bonds. Thereupon Lindquist was arrested and charged with the crime of forgery in signing the names of Stensbad and Little to said bonds. While under arrest he attempted to arrange with Deputy Sheriff Riemer, who was investigating said charge of forgery, to "fix" the case for the sum of $700, which he agreed to pay Riemer. Riemer pretended to fall in with the plan and some days thereafter, the exact date being May 17, 1923, Mrs. Lindquist, wife of Carl V. Lindquist, delivered said sum of $700 to the said Reimer. This money was traced back through Mrs. Lindquist to an attorney named Edgar B. Hervey, who obtained it at a drugstore at the corner of Fifth and Broadway in the city

of Los Angeles. Just before he had delivered it to Mrs. Lindquist, Hervey had been told by appellant to call at the drugstore and ask for a package which had been left there to be delivered to George Allen or Ruth Allen. Upon doing so he was handed a package which proved to be a loaf of bread wrapped in a towel, and in one end of the loaf of bread were seven one-hundred-dollar bills. These bills Hervey took from the package and delivered to Mrs. Lindquist.

Before a session of the grand jury held during the latter part of May, 1923, for the purpose of investigating a charge of attempted bribery by Lindquist of said deputy sheriff, the appellant testified, among other things, that on the day the package was delivered to Hervey at the drugstore and some hours earlier in the day, probably about 11 o'clock of said day, Hervey came to appellant while the latter was holding court and said that he had a chance to get Mr. Lindquist out on bail if they could raise $700. The transcript of the testimony taken on said hearing then continues as follows: ''I (appellant) asked him how he was to raise the $700.00. He told me Lindquist had said if he would come to me I knew where he could get the money. Now, Mr. Lindquist had told me, when he first got in this trouble, that if there was an opportunity for him to get out on bail, that he had a friend, whose name I don't know just now, but I can get it—I have a note that I made. As I recall, it was Mr. Rollins, who lives in an apartment house down here—he gave me the number; I don't know which apartment house it was. At the time he gave me the telephone number, and I called up the number, and it was the Pendleton or the Pelton apartments, and I talked with this man—asked him if he knew Mr. Lindquist; that Mr. Lindquist wished to get $700.00, if he could, for the purpose of getting his bail produced; and that if he would communicate with Mr. Hervey about the matter, that Mr. Hervey was his attorney and would arrange it. I gave him Mr. Hervey's address and told him what his phone number was; I am quite sure that that conversation occurred— well, I know it occurred in the morning, because it was after I went to lunch that I got a call back. He wanted to know who I was—very suspicious, apparently. Well, I told him who I was—I had no reason to hide it. I told him

I was Channing Follette; that I had known Mr. Lindquist; that this Mr. Lindquist was in trouble, and I didn't believe he was involved in any dishonesty connected with the transaction. He said, 'All right; I will see what I can do, and I will communicate with Mr. Hervey.' I said, 'See Hervey about it and come right down here to the court house'—I didn't make any bones about it, and had no reason to. I then heard from this man—it must have been about 12:30 or a quarter to one or one o'clock. It was either the day or the day before that Mr. Hervey was involved in some trouble. I didn't know anything about Mr. Hervey getting in trouble until after he was involved—I think the next day or two days after. I received a call that an effort had been made to reach Mr. Hervey, and that Mr. Hervey was not available, and the money, for the reason he didn't want to be known in the matter, and he felt his safety and protection required it—this same man that I talked to— . . . Q. That is where you got the $700.00? A. I didn't get the $700.00; Mr. Rollins was Mr. Lindquist's friend, and he agreed to produce the money, Mr. Rollins said he would check this money for Mr. Hervey— he didn't say 'Mr. Hervey,' but he said he would check the money at the drug store, and if Mr. Hervey would call for the money at the drug store—no, if Mr. Hervey would call and get the check in a telephone booth at the Angelus Hotel, that he could then go and get the money, and Mr. Rollins would not be known—didn't want to be known in the transaction—he would consider himself better off. It looked pretty funny to me, that here is a man going to produce $700.00, and going in this foolish surreptitious manner to get the money to Mr. Lindquist or Mr. Hervey. He said, 'I don't want to be known; I don't want to be mixed up with Lindquist's affair. I am ready to produce the money, but I don't care to be mixed up in it.' Q. That is, Mr. Rollins? A. Yes. I said, 'Well, all right.' And I called up Mr. Hervey on the telephone—I didn't get him right away but apparently when he came in from lunch he called me, or I called him—I don't remember which may have answered or called. I told him about this, where he could get the money. I asked him if he knew anything about Rollins—if Lindquist had talked to him about Rollins, or anything about it; and I told him just what he told me.

He said, 'Well, that is all right'—he would get the
money, . . . and Mr. Hervey was to go there at a certain
time; that is, the money would not be available until a cer-
tain time that day—I forget just when it was, but I think
around one or 1:30—and I went about my business, forget-
ting about it until I got another telephone call, saying
that the money was left in a check room at a drug store—
from this same fellow Rollins—whom I had no doubt is
available. I have his phone number and all that. Mr. Rol-
lins told me that they didn't give him a check; that one
had to call for the money in person. He didn't know who
was going to call for it, so he left it for a Mr. or Miss
Allen; and that if Mr. Hervey—he didn't say 'Mr. Hervey'—
he said if he would go and get the money there, to simply
call for a package for that party, and it would be available.
I couldn't get Mr. Hervey then—as he had gone out; and I
went down to the hotel where I thought Mr. Hervey would
be to get the check to get the money, and delivered the
message I had received. Q. You had told him previously,
had you, that you had told Mr. Hervey to go down there
to get it? A. I delivered the message I received, that if
he would go down there he would get it. Q. What was it
to be in? A. He said it would be in a package. I then
told Mr. Hervey he would have to call for it in person,
without a check; that he would simply have to go and ask
for this package. Q. This was a package of bills, was it, or
currency? A. I presume so. He didn't say what form it
would be in, but it would be in a package, he said—I don't
know. Q. You don't know whether it was silver or cur-
rency? A. I really don't know; but I don't imagine they
would have that much silver—that would be a pretty heavy
package. It may have been, though—I don't know; but
it was the money, no doubt; and I don't imagine he would
leave a check. Q. What size was the package? A. I don't
know what size the package was. A package of bills would
be, I imagine about that size (indicating); but I don't
know; I never saw the package. I didn't go down there and
get it, and I didn't talk with him further about it. It may
have been silver—I don't know. Q. Let's check back a
minute; Hervey had gone down here to the hotel and you
had phoned to him at his office and found he had left and
then you went to Hervey? A. I tried to get the message

'to Mr. Hervey over the telephone, that no check—that there wouldn't be anybody there for a check at all; that he would have to go and call for the package in person; and he apparently went and did so. Now, it is just dime novel foolishness, that, as I reflect· on it, has got my goat. Q. Let's see: Hervey, you found him at this hotel—which hotel was it? A. Mr. Hervey was waiting at the hotel. Q. Which hotel was it? A. The Angelus Hotel. Q. This was about what time of the day? A. Well, it must have been about 1:30. Q. What did you say to Hervey then? A. I said I had gotten a phone message that there would not be any check for him; that he would have to go in person and get a package, and ask for a package for Mr. Allen. I had told him that—I remember that very definitely; and whether or not he got it, I don't know. I asked Mr. Hervey if he wouldn't let me know if he got it all right, and let me know what the darned thing was all about, or something of that sort. The mystery of this business of chasing around hotels and things with packages, didn't appeal to me very much; but I couldn't see anything wrong in it. Q. You didn't see the package? A. No. Q. Where did Rollins tell you he had placed the money? A. He told me it was in a drug store—an Owl drug store on Broadway. Q. Whereabout in the drug store? A. In a check room, in a drug store on Broadway. Q. In a check room? A. Yes; he said it was checked—I don't know as he said a check room, but he said it was checked up in an Owl drug store on Broadway. . . . Q. Isn't it true that you described to Hervey the character of the package? A. No, I didn't. I didn't know the character of the package; I haven't seen the package to this day, and I couldn't tell you whether it was currency or cash, or what it was. . . . Q. And you positively say that you didn't leave that package there? A. Absolutely yes—I did not. Mr. Stafford: And you never saw the ticket, or anything at all? A. No, sir. Q. I ask you to examine this ticket, and examine the handwriting, 'George Allen or Ruth Allen'—is that your handwriting (showing check to witness)? A. No sir. Q. You never saw this ticket before? A. Never saw it in my life. . . . A. I just called Mr. Rollins once, but he called me twice. Q. And he stopped at this apartment house, the one of two names? A. They told me over the phone it went in through

an exchange, and they gave me the name of the apartment house. Q. And they knew who he was, did they—no trouble about finding him, or who he was— A. I had no trouble at all; they just connected me right away. Q. And the house was one of two, you thought? A. The Pendleton or Pelton Apartments.'' This testimony, together with numerous repetitions and reiterations of the same, was set out in the indictment. In substance the testimony of appellant before the grand jury might be briefly summarized as follows: That Lindquist, after he had gotten into this trouble regarding the forged bail bonds of Gilbert and Johnson, had told appellant that if there was an opportunity for him to get bail, that he, Lindquist, had a friend whose name was Rollins who would assist him in raising the money necessary to pay for a bail bond; that Rollins lived either at the Pendleton or the Pelton Apartments, and that Lindquist then gave to appellant Rollins' telephone number at these apartments, which appellant then wrote down on one of his cards; that thereafter Hervey came to appellant and told him that Lindquist had a chance to get out on bail if he could raise $700; thereupon appellant rang up Rollins at the Pendleton or Pelton Apartments and told him that Lindquist wished to get $700 with which to get bail, and that if Rollins would communicate with Mr. Hervey, Lindquist's attorney, the latter would arrange it, and that appellant then gave to Rollins Hervey's address; that Rollins said ''All right, I'll see what I can do and I will communicate with Mr. Hervey''; that this conversation occurred sometime before noon, and about 12:30 or a quarter to 1 o'clock, Rollins rang up appellant and told him that he, Rollins, did not want to be known in the matter, but that he would check the money at the drugstore, and that a check for the same could be found in a telephone booth at the Angelus Hotel; that thereupon appellant called up Hervey by telephone, or Hervey called up appellant, the latter was not certain, but in this telephone conversation appellant told Hervey where and how he could get the money, but that it would not be available until around one or one-thirty o'clock; that later Rollins again called up appellant and told him that the money would be left at the drugstore at the corner of Fifth and Broadway, but that there would not be any check for it, but that it would be delivered when

asked for in the name of Mr. or Miss Allen; that appellant, on receiving this second message, endeavored to telephone Hervey but not being able to reach him by phone, he went to the Angelus Hotel, where he found Hervey and communicated to him the contents of Rollins' second message; that appellant did not place the money in the drugstore, and that he did not write "George Allen or Ruth Allen" on the card or check which was left with the package containing the money, and that he never saw this card or check before it was shown him at the time he testified before the grand jury, and that he had never seen the money which was delivered to Hervey at the drugstore.

At the trial it was shown that there was no apartment house in the city of Los Angeles by the name of Pendleton, but there was one by the name of Pelton Apartments, and that Gilbert, Johnson and Lindquist resided there during a part of the months of April and May, 1923, when they were not public charges at the county jail. Lindquist testified that he did not know of any person by the name of Rollins; that he never had any conversation with appellant in which the name of Rollins was mentioned; that he never gave appellant any telephone number at which any person by the name of Rollins could be reached, and that he did not know at any time during the months of April and May, 1923, the telephone number of the Pelton Apartments so that he could repeat it without referring to a telephone book, and that the defendant did not in his presence write the name of Rollins with the telephone number on a card; that he knew Gilbert and Johnson and that he knew Gilbert went at times by the name of Gates, but never knew him by any other name; and that he never knew him by the name of Rollins.

The Pelton Apartments were owned and conducted by two brothers, C. R. Brown and R. B. Brown, during the months of April and May, 1923, and for a long time prior and subsequent thereto. These men testified that no person by the name of Rollins was stopping at said apartment house during the months of April and May, 1923, or at any other time; that they knew Gilbert by the name of Gates, but never knew him by the name of Rollins; that Gates, or Gilbert, registered at the Pelton Apartments on April 18th and left on the night of May 2, 1923, and that they had never seen him at the apartment house since that date.

Olive McPherson and Lucille E. Fennell, two telephone operators who had charge of the switchboard at the Pelton Apartments, testified that they knew of no such person as Rollins being at the Pelton Apartments during the months of April or May, 1923. Neither of these witnesses had any recollection of any call being received at the Pelton Apartments for a man by the name of Rollins during the month of May, 1923. Miss Fennell testified that she knew and remembered Gilbert under the name of Gates, but did not know him by any other name. Mr. John S. Cooper, the attorney of Gilbert, testified that Gilbert resided at the Pelton Apartments prior to and on and about May 1, 1923, but that he had not seen him, nor heard from him since said last-named date. In addition to these witnesses, B. F. Anderson, an investigator of the district attorney's office, testified that he visited the Pelton Apartments the last part of April or the first part of May, 1923, in search of Gilbert, and that he was not able to find him there, although he went to the room formerly occupied by Gilbert and his wife and searched for him in other parts of the house.

The witness Hervey testified, as did also the appellant, that appellant met Hervey at the Angelus Hotel and told him that he could get the money by calling at the drugstore at Fifth and Broadway and asking for a package left there for "George Allen or Ruth Allen." Hervey went direct from appellant to the drugstore, only one city block distant, and secured the money by asking for a package according to the instructions given him by appellant. The two attendants at the drugstore testified that this package had been left there less than an hour before it was delivered to Hervey by a person described as a man of medium build, and that at the time he left the package he wrote in their presence on a card or check "George Allen or Ruth Allen." One of these attendants testified that the person leaving the package at the drugstore was a man just about the size of appellant. This card or check was produced at the trial and a witness, by the name of Milton Carlson, who qualified as an expert on handwriting, testified that the handwriting upon the card or check was the handwriting of appellant.

The indictment, as we have already observed, contains a large number of assignments of perjury. **[5]** It may be

that the evidence is not sufficient to sustain all of such assignments, but the rule is well settled that while the indictment may embrace two, or more, or many assignments of perjury, if the evidence sustains one or more of the assignments it is not necessary for the prosecution to prove all of the charges. (*State* v. *Taylor, supra.*) It will not be necessary, therefore, to examine the evidence with a view of ascertaining whether it is sufficient to sustain all of the assignments of perjury set forth in the indictment. Some of these assignments may possibly be upon immaterial matters. Others were upon collateral issues to the real subject under investigation by the grand jury at the time appellant testified before that body. It will be remembered that the grand jury had under investigation the attempted bribery of Deputy Sheriff Riemer. The money which was to be used to bribe this officer was the $700 which Hervey procured at the drugstore at the corner. of Fifth and Broadway. In determining, therefore, who were the guilty parties in this crime, if any had been committed, it became of vital importance to determine the identity of the person leaving at the drugstore the package containing the $700. Hervey testified that he went to the drugstore and procured the money under the direction of appellant. It therefore became material for the grand jury to know whether or not the appellant himself had left the money at the drugstore for Hervey. As for the appellant, this was the crux of his whole testimony before the grand jury. It was charged in the information that appellant's testimony, denying that he had been at the drugstore and there left the package containing the money, was false and untrue, and as this is the most serious and vital assignment of perjury against the appellant contained in the whole indictment, we will examine the evidence offered by the prosecution with a view of ascertaining whether the same supports this assignment. If the evidence supports this assignment, then it will be unnecessary to consider the testimony in the light of the remaining assignments. On the other hand, if the evidence fails to support this assignment, then, as we view the case, a verdict of conviction upon any other assignment would be based upon mere collateral, if not immaterial, matters.

In proof of the falsity of the testimony of appellant that he did not leave the money at the drugstore for Hervey, the two attendants at the drugstore with whom the money was left testified at the trial that the person who left the package containing the money was a man of "medium build," and that he wrote "George Allen or Ruth Allen" on the check left with the package. The witness Carlson testified that the writing on the card was that of appellant. This testimony in any ordinary action, if believed by the jury, would be sufficient to prove that appellant was the person who left the money at the drugstore. [6] But in prosecutions for perjury, the falsity of the statement claimed to be perjurious must be proven by two witnesses or the testimony of one witness and corroborating circumstances. (Pen. Code, sec. 1103a.) Was the testimony, therefore, of the drugstore attendants and that of Carlson, the handwriting expert, if legally corroborated, sufficient to support the verdict finding the defendant guilty of perjury? [7] Under the decisions of the appellate courts of this state, positive evidence is absolutely necessary to support a charge of perjury, and circumstantial evidence alone is never sufficient. (*People* v. *Wells,* 103 Cal. 631 [37 Pac. 529]; *People* v. *Bureham,* 69 Cal. App. 614 [232 Pac. 149].) Yet this does not mean that there must be the positive and direct evidence of a witness who has testified to the falsity of the testimony given by the accused. [8] It does not mean, in order to sustain the verdict in this case, based upon the assignment under consideration, that at least one witness must testify that he actually saw and identified the appellant as the person who did leave the money at the drugstore, but such conviction must stand if there is any testimony showing a contrary state of facts from that sworn to by appellant before the grand jury and incompatible with his evidence there given, provided the same is legally corroborated.

In *People* v. *Porter,* 104 Cal. 415 [38 Pac. 88], the supreme court, in considering the sufficiency of the evidence in that action to support a verdict of conviction for perjury, states the rule as follows: "It is contemplated by the statute that there must be testimony of one witness to facts that are absolutely incompatible with the innocence of the accused

before a conviction is justified by the law." In *People* v. *Chadwick*, 4 Cal. App. 63 [87 Pac. 384], the court says: " 'Direct evidence' is declared in section 1831, Code of Civil Procedure, to be 'that which proves the fact in dispute directly without an inference or presumption and which in itself, if true, conclusively establishes that fact.' Upon a trial for perjury, direct evidence . . . includes any positive testimony of a contrary state of facts from that sworn to by defendant at former trial, or which is absolutely incompatible with his evidence, or physically inconsistent with the facts so testified to by him." And in *People* v. *Casanova*, 54 Cal. App. 439 [202 Pac. 45], the same rule is expressed by the court and in the following language: "That there was such legal evidence, sufficient to meet the requirements of the statute, we have no doubt. The statute respecting the *quantum* of evidence necessary in perjury cases will be satisfied if there be the testimony of one witness to facts that are absolutely incompatible with the innocence of the accused, corroborated by circumstances which, of themselves and independently of such directly inculpatory evidence, tend, with a reasonable degree of certitude, to show that the accused is guilty as charged. 'Upon a trial for perjury direct evidence is not limited to a denial in *ipsissimis verbis* of the testimony given by the defendant, but includes any positive testimony of a contrary state of facts from that sworn to by him at the former trial, or which is absolutely incompatible with his evidence, or physically inconsistent with the facts so testified to by him.' " Viewed in the light of these decisions, the testimony in this case of the two drugstore attendants and that of the handwriting expert is positive evidence tending to prove that appellant left the money at the drugstore and it is therefore absolutely inconsistent with his sworn statement before the grand jury that he did not do so, and is consequently incompatible with his innocence of the charge against him. This testimony, if believed by the jury without any inference or presumption, conclusively proved the fact that defendant was the person who left the money for Hervey. [9] The only doubt in our minds as to the sufficiency of this evidence was whether expert testimony would comply with the requirements of the rule prescribed in prosecutions for perjury. We have not been able to find

any authority holding that expert testimony is not sufficient
in such a case. On the other hand, the decisions of our
courts are to the effect that no distinction is to be made
between expert testimony and other evidence as to its weight
or preference. In the late case of *Rollins* v. *Porterfield*, 183
Cal. 466, 469 [191 Pac. 913, 914], the court said: "What-
ever the individual opinion as to the value of expert testi-
mony, it has been clearly settled in this state that as regards
the preference or weight to be given the testimony in any
particular case, the law makes no distinction between expert
testimony and evidence of other character." The same
principle has been held in a long list of California cases.
(*Estate of Blake*, 136 Cal. 306 [89 Am. St. Rep. 135, 68
Pac. 827]; *People* v. *Wilkins*, 158 Cal. 530 [111 Pac. 612];
*Estate of Hess*, 183 Cal. 589 [192 Pac. 35]; *Estate of Nel-
son*, 191 Cal. 280 [216 Pac. 368].)

The testimony of the drugstore attendants and the hand-
writing expert being sufficient to establish the falsity of ap-
pellant's statements before the grand jury that he did not
leave the package containing the money at the drugstore,
the next question that arises is whether there is sufficient
corroboration of this testimony to meet the requirements
of section 1103a of the Penal Code. In the first place,
we have the testimony of the witness Hervey who testi-
fied that appellant, only a few minutes before Hervey called
at the drugstore and asked for the money, had told him that
the money was at the drugstore and that he could get it
by calling for a package left there for "George Allen or
Ruth Allen." This circumstance standing alone would
amount to incriminating . evidence against the appellant.
That appellant informed Hervey where and how to get
the money which was to be used for the purpose of brib-
ing the officer, raised a strong inference of appellant's com-
plicity in said crime, and when this evidence is considered
in connection with the other evidence in the case, that ap-
pellant actually left the money at the drugstore for Hervey,
it tended in a marked degree to corroborate this latter
evidence.

In addition, however, to the testimony of Hervey, we have
the witness Lindquist and the proprietors and employees of
the Pelton Apartments. Lindquist testified that he had no

friend by the name of Rollins and that he did not tell appellant he had, or that any person by the name of Rollins would help him get bail. The witnesses from the Pelton Apartments testified that no person by the name of Rollins resided there at or near the seventeenth day of May, 1923, the day appellant testified that he telephoned to Rollins and the latter informed him that the $700 would be left at the drugstore. Appellant having given Hervey information as to where and how the latter could get the money, and having denied that he left the money where he told Hervey he would find it, was of necessity obliged to offer some explanation as to how he came into possession of the information he imparted to Hervey. This explanation was that Rollins had informed him of the place where the money would be left. The fact that his explanation as to the source from which he acquired this information was proven to be false, by the testimony of the witness Lindquist and the proprietors and employees of the Pelton Apartments, strongly corroborated the other evidence in the case that the appellant himself placed the money at the drugstore for the use of Hervey.

[10] The corroboration required under section 1103a of the Penal Code is the same as that required under section 1111, regarding the testimony of an accomplice. "There is no essential difference between Section 1103a of the Penal Code and Section 1111, in so far as the law requires that the corroborating evidence 'shall tend to connect the defendant with the commission of the offense.'" (*People* v. *Woodcock*, 52 Cal. App. 412, 418 [199 Pac. 565, 568].) "The corroborating evidence may be slight . . . ; nevertheless, the requirements of the statute are fulfilled if there be any corroborating evidence which, of itself, tends to connect the accused with the commission of the offense." (*People* v. *Melvane*, 39 Cal. 614, 616; *People* v. *Clough*, 73 Cal. 348 [15 Pac. 5]; *People* v. *McLean*, 84 Cal. 480 [24 Pac. 32]; *People* v. *Barker*, 114 Cal. 617 [46 Pac. 601]; *People* v. *Martin*, 19 Cal. App. 295 [125 Pac. 919].) The testimony of appellant before the grand jury that he did not leave the money at the place indicated, must be considered in connection with his further testimony that Rollins told him the money was there in a conversation which he had with Rollins over the telephone at the Pelton Apartments,

and that he had such conversation with Rollins at the instance of Lindquist. Proof that Lindquist had no such conversation with appellant, and that he knew no such person by the name of Rollins, and that no such person by the name of Rollins was at the Pelton Apartments at the time appellant claims he telephoned to Rollins tended to prove the falsity of his testimony that he did not leave the money at the drugstore. Especially is this true when we take into consideration the further fact that appellant had told Hervey where the money was left and how it could be obtained. These statements of appellant before the grand jury were so intimately connected and were so dependent one upon the other, that proof of the falsity of one of such statements tended to prove the falsity of the others. We are, therefore, of the opinion that the evidence given by the drugstore attendants and Carlson that defendant left the money at the drugstore finds sufficient corroboration in the testimony of Hervey and also in the testimony of Lindquist and the proprietors and employees of the Pelton Apartments.

[11] In connection with appellant's claim that the evidence is not sufficient to support the verdict, he makes the further contention that he was acquitted of the charge set forth in the first indictment and that such acquittal was an acquittal on all assignments of perjury set forth in the second indictment which were also contained in the first indictment, and that the court, in determining the question as to whether the evidence is sufficient to support the verdict, is precluded from considering any evidence in the case which is applicable to any of the assignments of perjury contained in the first indictment. As we have before noted, two indictments were found against appellant. In the first only a small portion of appellant's testimony before the grand jury was set out and charged to have been false, and in the second a much larger portion of his testimony before the grand jury was alleged to be untrue, including all that contained in the first indictment. By order of court the two actions were consolidated and the appellant was placed on trial on both indictments. Thereafter the case was tried as one action. In the instructions given by the court, not only those given by it upon its own motion and those at the request of the People, but also

those given at the request of the appellant—the court made frequent references to "the indictment" and in no instance was any reference made to the first indictment or to the second indictment, or to any other fact or circumstances indicating that the defendant was being tried upon more than one indictment. In the instructions given at the request of appellant, "the indictment" is referred to twenty-four times, and in the instructions requested by appellant and refused by the court appellant refers to "the indictment" nine times, but in no instance in any of these instructions, which were either given or refused by the court, does appellant refer to the first indictment or the second indictment, nor does he ask or request the court that the jury be instructed to render separate verdicts upon the two indictments. The jury rendered its verdict finding "the defendant guilty of perjury as charged in the indictment." It was numbered, however, 21,289, being the number assigned to the action against the defendant upon the second indictment and before the actions had been consolidated. It would appear from these references to the proceedings of the court, that not only the court and the prosecution, but the appellant himself, treated the indictments, after the order of the court consolidating the actions, as one indictment. The jury, in rendering their verdict in the form in which they did, simply followed the course pursued by the court and all the parties to the action, including the appellant, and we think under these circumstances their verdict may well be treated as a general verdict finding the defendant guilty as charged of the crime for which he was placed upon trial in the actions as consolidated. Even if the jury had plainly indicated that their verdict only applied to the second indictment, they would thereby have found appellant guilty of all charges contained in the first indictment for the reason, as already stated, that all assignments of perjury set forth in the first indictment were included in the second indictment.

[12] But conceding for the sake of argument the contention of appellant that there were two distinct and separate indictments upon which the defendant was placed on trial, and that the jury's verdict only applied to the second indictment, did the failure of the jury to render a verdict upon the first indictment acquit the defendant of

those assignments of perjury contained in the second indictment which were also charged in the first? In support of appellant's claim that such verdict was an acquittal of all the charges which were contained in both . indictments, he relies upon a statement of the law found in 16 Corpus Juris at page 1107, as follows: ''A conviction and judgment upon one of several counts, with no verdict upon the others, is an acquittal of the others.'' A large number of cases are cited in the above work in support of this text. We have examined these cases but failed to find that any of them go to the extent claimed for them by appellant. And our attention has not been directed to any authority which holds that where a defendant is upon trial on two or more indictments, and the jury renders a verdict of guilty upon the charge contained in one of said indictments and fails to render any verdict upon the charge contained in the other indictment, that such failure of the jury to render a verdict upon one indictment affects in any manner whatever the verdict rendered upon the other of said indictments. The most that these authorities hold is that the failure of a jury to render a verdict as to all the charges upon which a defendant is being tried, is equivalent to or operates as an acquittal of the defendant as to those charges upon which no verdict was rendered and would be a bar to any subsequent prosecution of the defendant upon said charges. This result would arise not from any verdict of the jury, but from the action of the court in discharging the jury without rendering a verdict. The same result would follow if the defendant had been placed upon trial upon a valid indictment before a jury and the jury discharged without the consent of the defendant and before the introduction of any evidence. The defendant could not thereafter be further prosecuted upon the charge contained in said indictment, not because he had been acquitted by the jury at the former hearing, for he had not been, but because he had been once placed in jeopardy at said former hearing, and therefore, could not be again brought to trial upon the same charge. As far as the accused is concerned, the proceedings at the first hearing operated as and were equivalent to an acquittal of him, for the reason that he could not be further prosecuted on said charge. This is made clear in a number

of the cases cited in Corpus Juris in support of the statement from the text above quoted. "Doubtless, where a jury, although convicting as to some, are silent as to other counts in an indictment, and are discharged without the consent of the accused, as was the fact in the Dealy case, the effect of such discharge is 'equivalent to an acquittal,' because, as the record affords no adequate legal cause for the discharge of the jury, any further attempt to prose-cute would amount to a second jeopardy, as to the charge with reference to which the jury had been silent." (*Selvester* v. *United States*, 170 U. S. 262 [42 L. Ed. 1029, 18 Sup. Ct. Rep. 580, see, also, Rose's U. S. Notes].)

"Where on a trial on an indictment of different counts, there is a specific verdict of guilty on one count, and the verdict is·silent as to the other counts, and there is a conviction on the verdict of guilty, it is a bar to further prosecution on the counts on which the verdict is silent. So much is settled in this state." (*People* v. *Dowling*, 84 N. Y. 478, 483.)

"The question of guilt or innocence of both offenses charged was submitted to the jury, and that body found him guilty of but one, and designated which. Trial and conviction upon this indictment is a bar to any subsequent prosecution for the larceny charged. . . . It will be equivalent to a verdict of not guilty on such counts." (*Guenther* v. *People*, 24 N. Y. 100.)

It follows, therefore, in the present action, that the appellant was not acquitted of the assignments of perjury set forth in the first indictment by the failure of the jury to render a verdict upon the charges contained therein. If any advantage can accrue to appellant by such failure, it would be that he could plead once in jeopardy to any attempt which might be made in the future to prosecute him upon said charges. His claim, however, that the court is precluded from considering the evidence applicable to the assignments of perjury set forth in the first indictment, in determining whether the evidence is sufficient to support the verdict of the jury as rendered, is untenable and finds no support in law or reason. As we view the law, it is the right and duty of the court to resort to all such evidence in deciding the question of the sufficiency of the evidence to justify the judgment.

The next point urged by appellant in support of his appeal is that the court erred in the admission of the following evidence: (1) That relating to an alleged conspiracy between appellant and Lindquist involving the forging and uttering of certain bail bonds, and in the refusal of the court to permit appellant to show by the records of a former case that he had been acquitted by the jury of said charge of uttering said forged bail bonds; and (2) In permitting the prosecution to impeach its own witness Hervey, and in so doing to introduce incompetent evidence under the guise of refreshing his recollection.

[13] The testimony relating to the conspiracy between appellant anl Lindquist involving the forging and uttering of certain bail bonds was admitted over the repeated and strenuous objection of appellant. It tended to show that on the day Lindquist was released from prison, he called upon appellant and arranged with him for the release of Gilbert and Johnson, then in the county jail awaiting trial upon the charge of grand larceny. The bonds of each had been fixed by the magistrate at the sum of $10,000. The agreement between appellant and Lindquist was that for a consideration of $1,400, to be paid appellant, he would execute and deliver releases for these two prisoners. Accordingly, Lindquist appeared at the county jail on the evening of the same day with such orders, and upon them Gilbert and Johnson were released, and appellant was paid said sum of $1,400. Later on appellant produced two bail bonds which purported to be given for the release of Gilbert and Johnson, but which were proven to be forgeries. Lindquist was thereupon arrested, charged with the forgery of said bonds, and while under arrest he attempted to bribe Deputy Sheriff Riemer, who had said matter under investigation, "to fix" said case, and was to pay him the sum of $700. It was this sum of $700, which was to be used to bribe Riemer, that was left at the drugstore, and which the witness Hervey secured therefrom and gave to Mrs. Lindquist. Evidence was admitted which tended to show that the money was left at the drugstore by appellant, which evidence, if legally sufficient and if true would prove the charge of perjury upon which defendant was then being tried. It was the theory of the prosecution at the trial, and the same contention is now made by the

attorney-general, that the testimony relative to the conspiracy of appellant and Lindquist involving the forging and uttering of these bail bonds showed a motive on the part of appellant and offered a reason for his assisting Lindquist to extricate himself from the trouble in which he found himself, to the extent of supplying the money with which he hoped to bribe the officer. The grounds upon which this evidence was objected to were that it showed or tended to show the commission of other crimes by appellant and, furthermore, that he had theretofore been placed upon trial for uttering said forged bail bonds and had by a jury been acquitted of said charge and, therefore, the prosecution was estopped from again litigating the issue decided in said former action. Appellant at the time of making said objection offered to prove by the record of said former action his acquittal of said charge of forgery, to which offer the district attorney objected and said objection was sustained by the court. It is unquestionably the general rule that evidence which tends to show that the accused is guilty of the commission of crimes other than that for which he is then on trial is inadmissible against him. There are, however, exceptions to this general rule, and one of these exceptions is that where the evidence, to which objection has been made, although it shows defendant guilty of other crimes, tends directly to prove the crime for which he is then being tried, such evidence is admissible against him on said trial. (*People* v. *Lane,* 101 Cal. 513 [36 Pac. 16]; *People* v. *Wilson,* 117 Cal. 688 [49 Pac. 1054]; *People* v. *Valliere,* 123 Cal. 576 [56 Pac. 433]; *People* v. *Brown,* 130 Cal. 591 [62 Pac. 1072]; *People* v. *Cook,* 148 Cal. 334 [83 Pac. 43]; *People* v. *Argentos,* 156 Cal. 720 [106 Pac. 65].) In the case of *People* v. *Cook, supra,* at page 341, the court said: "The result of the discussion, I think, may be summed up in the proposition that evidence which is relevant to any material fact in issue in a criminal case cannot be excluded because it may prejudice the defendant by proving him guilty of other crimes than that for which he is on trial." In *People* v. *Argentos, supra,* at page 725, the court said: "Where it appears that evidence of the commission of such other crime has a direct and logical bearing upon the question of the guilt of the accused as to the crime with which he is charged, evidence of the commission of such other

offense is admissible." And on page 726 the court further said: "What weight that evidence might have was a question for the jury, but that it was admissible, notwithstanding it showed the defendant was charged with some other offense than the one for which he was being tried, and though its tendency might have been to prejudice him in the minds of the jury, is not, under the authorities, open to question." Such evidence is always admissible to prove motive. In the same case of *People* v. *Argentos, supra,* at page 725, the court also said: "But this evidence was not admitted with a view merely of proving that defendant had been charged with another offense. It was offered and, we think, properly admitted as bearing on the question of motive." In *People* v. *Cook, supra,* at page 340, the following language was used by the court: "But when some distinct offense is so connected with the crime charged in the indictment that proof of the former, in connection with other evidence, would sustain a probable inference of guilt as to the latter, such distinct offense may be proved—as, for instance, to show a motive on the part of defendant to commit the crime charged." [14] This evidence regarding the conspiracy between appellant and Lindquist in relation to these bail bonds would undoubtedly have a tendency to show a motive on the part of appellant for furnishing the funds with which the officer was to be bribed "to fix" the case against Lindquist. If the charge could be dismissed against Lindquist, it would probably result in the matter being dropped, and appellant might also escape prosecution thereon. While, as far as we have been able to ascertain from the record, it did not appear that appellant was then under indictment for uttering said forged bail bonds, it does appear that at sometime subsequent thereto he was placed on trial on said charge. From this fact it is only reasonable to infer that he was then at least under suspicion, and that Riemer was then investigating his connection with the forged bail bonds, as well as that of Lindquist. He was therefore, equally with Lindquist, interested in having the investigation of said charges brought to a speedy end, and, to him and Lindquist, a favorable termination. Any evidence, therefore, that would tend to show a motive on appellant's part for furnishing the bribe money would be material as tending to prove

that said money was furnished by him, and proof that he furnished the money and left it at the drugstore for Hervey went to the very gist of the charge that his statement before the grand jury that he did not leave it there was false. There was, therefore, no error in admitting this testimony, unless the verdict of acquittal rendered in appellant's favor on the forgery charge rendered it inadmissible.

[15] As to the effect of a verdict of acquittal, under such circumstances, the authorities in this state are few, but we think they establish the rule that such a verdict does not render evidence of other crimes, although these other crimes were made the subject of prior indictments and the defendant had been tried on such charges and acquitted of them, inadmissible in a subsequent action against the defendant on another and different charge. In the early case of *People* v. *Frank*, 28 Cal. 507, the question was directly before the court and decided adversely to appellant's contention. On page 515 of the opinion in this case, the court said: "The exception to the admission of certain other drafts claimed to have been forged and uttered by defendant about the same time, for the purpose of proving guilty knowledge, on the score that they had been the subject of other indictments upon which the defendant had been tried and acquitted, is not in our judgment well taken. It is well settled that in cases like the present it may be shown that the defendant uttered, at or about the same time, other forged notes or bills, whether of the same kind or a different kind, or that he had in his possession other forged notes or bills, tending to prove that he knew the note or bill in question to be forged. (Roscoe on Cr. Ev., 90 *et sequens;* 1 Phil. on Ev., Cow. & H. Notes, 768; 3 Greenleaf on Ev., sec. 15.) Nor does it matter if such other notes or bills are the subjects of other indictments pending at the time. (*Commonwealth* v. *Stearns*, 10 Met. (Mass.) 256.) And in *Houston's Case*, 1 Bailey (S. C.), 300, it was held that the principle upon which such evidence is admitted is unaffected by the fact that the defendant has been tried and acquitted upon the notes or bills produced in evidence, although the force of the evidence may be thereby weakened." The only other case in this state upon the subject, to which our attention has been

called, is the recent case of *People* v. *Berry,* 191 Cal. 109 [215 Pac. 74]. No reference was made in this latter case to the Frank case, and there is nothing to be found therein which directly or indirectly overrules the earlier case, or lays down any different rule than that enunciated in the Frank case. In *People* v. *Berry,* the supreme court said: "It cannot be successfully said that by the acquittal of the defendant of all but one of the crimes of the consolidated indictment that the jury found the defendant was not a member of a general conspiracy, but of only one conspiracy, and hence the evidence of the other offenses was inadmissible, and for that reason the defendant did not have a fair and impartial trial. We have no doubt that evidence of each and all of the enumerated transactions, whether covered by the indictment or not, was admissible under the similar offense rule as tending to prove a conspiracy. The interlocking of the participants in the various frauds, their common use of the same fictitious entities, their uniform insistence that their banking needs in carrying out their numerous swindling operations should be entrusted solely to the defendant as assuring an element of safety, were facts justifying an inference that a general conspiracy existed, and the defendant's guilty connection therewith was abundantly shown." In addition to the above statement, and immediately following it, the court further said, "If the defendant were to be tried again on the Herr transaction, the prosecution would, it appears clear, be entitled to prove each of the transactions, although the defendant had been acquitted on some of them. (*McCartney* v. *State,* 3 Ind. 353 [56 Am. Dec. 510]; *Bryant* v. *United States,* 257 Fed. 382, 385 [168 C. C. A. 418]; Zobine on Federal Crim. Law Proc., sec. 451; *Walsh* v. *United States,* 174 Fed. 615 [98 C. C. A. 461]; *Bell* v. *State,* 57 Md. 108, 133.) As these transactions would be admissible in a new trial it follows that their admission in this case was not error." Upon a rehearing the court struck out this latter paragraph from its opinion. No reason was given by the court for its elimination of this statement from its opinion, and appellant argues that the reason must have been that the court did not consider that the law was correctly stated therein, and therefore, that this case is an authority sup-

porting his contention. In view of the fact that the judgment of conviction rendered by the trial court was affirmed by the supreme court, we are not prepared to agree with appellant in his contention or to give to the case of *People* v. *Berry*, 191 Cal. 109 [215 Pac. 74], the construction claimed for it by the appellant. On the oher hand, we think the opinion in this case (as it now stands) is in accord with the opinion rendered in *People* v. *Frank, supra,* and that under the rule as enunciated in these cases the evidence relating to the forged bail bonds was admissible, notwithstanding that defendant had been previously acquitted of the crime of uttering said bonds.

As we have already seen, appellant at the time he interposed his objection to the introduction of the evidence relative to the forged bail bonds, offered to prove by the records of the former action that he had been acquitted by a jury therein of forging said bail bonds. It is now contended (in the reply brief of appellant for the first time) that even if said record was not admissible to show that the offered testimony was inadmissible, or in other words to show an estoppel as against the prosecution, appellant was still entitled to have said record of his acquittal before the jury for the purpose of weakening the effect of the evidence against him. In other words, as against the testimony of the prosecution that he had uttered the forged bonds, he claims he was entitled to show as a part of his defense that he had been acquitted of said charge. The authorities are not in entire accord upon this question, but we find it unnecessary to pass directly upon this question in this action. We have already attempted to show that said record was not admissible to prove an estoppel and thereby prevent the prosecution from proving appellant's connection with said forged bonds. This was the only purpose for which said record was offered. If it were admissible for that purpose, then it would have been proper for the appellant to have made said offer at the time he did, that is, before the introduction of any evidence by the prosecution regarding the forgery of said bail bonds. Had the court accepted said offer and admitted said record, it would then have been its duty to have passed upon the question of estoppel before admitting any evidence relative to appellant's connection with said forged bail bonds. But, if the

record of the former action had been offered simply to weaken the case of the People, then it was a matter of defense, and could not have been properly offered or admitted during the People's case. Our attention has been called to a number of instances when appellant, during the trial, offered to prove by said record his acquittal of the charge of uttering said bail bonds, but these offers were all made while the prosecution was putting on its case and in connection with appellant's objection to the admission of evidence regarding the forged bail bonds. These objections to the admission of such evidence were, in our opinion, all properly overruled by the court, and the refusal of the court at said times to entertain appellant's offers to introduce the record in the former action was also proper and free from error. Our attention has not been called to any offer of appellant to prove said record as a part of his case or as a defense of the action against him. If said record were admissible at all, it was admissible only as a defense and as a part of appellant's case. As far as we are able to ascertain from the record, until the filing of the reply brief by appellant, neither in the trial court, nor in this court, had the claim ever been made by appellant that his said offers to prove the record of said former action were made as a part of his defense and for the purpose of rebutting the case made against him by the prosecution. On the other hand, the times at which said offers were made, and the language used on the occasion of the record being offered, indicate clearly that appellant's sole object in making said offer was for the purpose of estopping the prosecution from proving appellant's connection with said forged bail bonds. Under these circumstances, it was not error on the part of the court to have refused to admit said record. Had the offer been made at the proper time, that is, as a matter of defense, and for the purpose of rebutting the evidence offered on the part of the prosecution, and had the court then denied said offer, a different case would have been presented which might call for a different conclusion.

[16] The other assignment of error in the admission of evidence was directed to the action of the court in permitting the prosecution, over the objection of the defendant, to cross-examine and impeach the witness Hervey, a witness

called on behalf of plaintiff, and to read to said witness for the purpose of refreshing his memory, as well as of impeaching him, portions of his testimony given before the grand jury. The witness Hervey testified that appellant, immediately on their leaving the Angelus Hotel and on their way from said hotel to the corner of Fourth Street and Broadway, told him that if he would go to the Owl Drugstore at the corner of Fifth Street and Broadway and inquire for a package which had been left there for George Allen or Ruth Allen, that one would be given him, and that acting upon these instructions from appellant he went to this drugstore, asked for the package as directed by appellant, and a package was delivered to him containing a loaf of bread, in one end of which was the $700 in bills. He was then asked by the prosecution whether appellant had told him that he would find the money in a package with a loaf of bread and he answered that he did not remember. The prosecution, over the objection of appellant, then read to the witness Hervey portions of his testimony given before the grand jury, in which this witness had stated that appellant had told him, on their way from the hotel, that the money would be in a package with a loaf of bread. In answer to questions by the district attorney, as to whether he gave said testimony before the grand jury, Hervey stated that if it was in the transcript he believed he so testified, but that he had no recollection of appellant ever telling him that he would find the money in a loaf of bread or in a package with a loaf of bread. Appellant now contends that the admission of this testimony was error, for the reason that Hervey gave no testimony that was adverse to the prosecution, but he simply stated that he was unable to recollect the conversation to which he testified before the grand jury. Appellant concedes that had Hervey testified at the trial that appellant had not told him that the money was in a package with the loaf of bread, then it would have been proper for the prosecution to have shown that he made statements inconsistent with the testimony as then given, but as Hervey only stated that he was unable to remember any such conversation with appellant, then it was highly improper and extremely erroneous to permit the prosecution to prove the statements made by Hervey before the grand jury. This question is not a new one to the

courts of this state, but from the case of *People* v. *Jacobs,* 49 Cal. 384, down to very recent times, the supreme court has consistently and persistently enunciated the rule contended for by appellant. (*People* v. *Jacobs,* 49 Cal. 384; *People* v. *DeWitt,* 68 Cal. 584, 588 [10 Pac. 212]; *People* v. *Wallace,* 89 Cal. 158, 164 [26 Pac. 650]; *People* v. *Mitchell,* 94 Cal. 550, 566 [29 Pac. 1106]; *In re Kennedy,* 104 Cal. 429, 431 [38 Pac. 93]; *People* v. *Conkling,* 111 Cal. 616 [44 Pac. 314]; *People* v. *Crespi,* 115 Cal. 50, 55 [48 Pac. 863]; *People* v. *Creeks,* 141 Cal. 529 [75 Pac. 101].) In the last-named case of *People* v. *Creeks,* at page 531, the court states the rule as follows: ''Where a witness called by a party has simply failed to testify to all that party expected or desired, but has not given testimony against him, it is not permissible for the party calling him to prove that such witness had previously made statements which, if sworn to at the trial, would tend to make out his case.'' In the more recent case of *Estate of De Laveaga,* 165 Cal. 607, 631 [133 Pac. 307, 317], the court states the rule in the following language: ''Assuming that contestant had the right on the ground of surprise to impeach Mrs. Cebrian by showing that she had made, at other times, statements inconsistent with her present testimony (Code Civ. Proc., secs. 2049 and 2052), he had no right to show previous statements made by her as to matters concerning which she failed to testify at all on the trial, as for instance upon matters as to which she said that she did not remember.'' We are unable to find anything at variance with this rule as above enunciated in any of the authorities to which our attention has been called in the brief of the attorney-general. We think this rule must, therefore, be held to be the settled law of this state. According to this rule it was clearly error for the court to permit the prosecution to prove the statements of Hervey before the grand jury as to what appellant told him in regard to finding the money in a package with a loaf of bread, in view of the fact that Hervey did not deny having a conversation, but simply testified that he did not remember it.

Appellant makes the further contention that the court erred both in refusing to give certain instructions proposed by him, and in giving certain other instructions at the request of the prosecution. Appellant offered five instruc-

tions, purporting to set forth a correct statement of the law requiring the testimony of two witnesses, or of one witness and corroborating evidence in order to convict in prosecution for perjury. The instructions were all refused by the court, and, at the request of the prosecution, the court instructed the jury as follows:

"Perjury must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances, and it is not sufficient where the testimony of two witnesses are relied upon that each of the witnesses testified to different false statements made by the defendant, but the law requires in such case that the two witnesses testify to one or more statements found by the jury beyond all reasonable doubt, to have been falsely made by the defendant while under oath.

"In this case it is not the theory of the prosecution that any two witnesses have testified to false statements made by the defendant, but it is the theory of the prosecution that one witness has testified directly to the false statements made by the defendant and that the testimony of such witness is corroborated by the circumstances, and that each of the two witnesses who have testified to false statements made by the defendant, corroborate.

"It is therefore necessary for you to understand what is meant by the word 'corroborate' and 'corroboration.' To corroborate means to strengthen, to make more certain, to add weight or credibility to a thing, to confirm by additional security, to add strength. Evidence which does any of these things, is evidence which corroborates, and is corroborating evidence. It does not mean facts which, independent of the evidence being corroborated, will warrant a conviction, but it is evidence which tends to prove the defendant's guilt independent of the evidence which is corroborated." If this instruction contains a correct statement of the law relative to the character of the evidence required in prosecutions for perjury, we are of the opinion that there was no error on the part of the court in refusing appellant's proposed instructions upon the subject of corroborating evidence. Appellant criticises this instruction in two respects. First, because, as he contends, it assumes that the defendant made false statements, and, secondly, because it does not correctly state the law. [17] As to the first criticism, that is,

that this instruction assumes that appellant made the false statements with which he was charged, we are not of the opinion that, assuming this criticism to be well taken, the jury were misled by the instruction. The jury were repeatedly told by the court in other instructions that the defendant could not be convicted of perjury unless the statements charged to be false were proven so beyond a reasonable doubt by the testimony of two witnesses, or of one witness and corroborating circumstances. [18] In support of the further criticism that this instruction does not correctly state the law, appellant directs our attention to the following portion thereof: "It is, therefore, necessary for you to understand what is meant by the words 'corroborate' and 'corroboration.' To corroborate means to strengthen, to make more certain, to add weight or credibility to a thing, to confirm by additional security, to add strength. Evidence which does any of these things is evidence which corroborates and is corroborating evidence." In *People* v. *Compton,* 123 Cal. 404, 411 [56 Pac. 44, 48], in discussing an instruction in some respects similar to that under consideration, the supreme court said, "Here the jury was told that it is sufficient if such corroborative evidence tends in any way to connect the defendant with the commission of the crime. Such is not the law. It could tend to connect him with the crime by considering it with the testimony of the accomplice; yet, if it is necessary so to consider, it would not be legally sufficient. It is legally sufficient only if, standing alone, it tends so to connect him." Had the instruction under consideration in the present action ended with the portion thereof last quoted, it might come within the objection indicated in *People* v. *Compton, supra,* but it will be noted that the instruction continues with the following sentence: "It does not mean facts which independent of the evidence being corroborated, will warrant a conviction, but it is evidence which tends to prove the defendant's guilt, independent of the evidence which is corroborated." In this concluding sentence of the instruction, the jury were correctly told that corroborating evidence in a prosecution for perjury "is evidence which tends to prove defendant's guilt independent of the evidence which is corroborated." This statement in the instruction not only states the law upon the subject correctly, but renders the instruction as a whole

free from the criticism of the appellant. We are, therefore, of the opinion that the court did not err in giving the foregoing instruction, nor was any error committed by the court in refusing the five instructions proposed by appellant and hereinbefore referred to. It is conceded that the corroboration required in perjury cases is the same as that required of testimony given by an accomplice. In either case it is a sufficient compliance with the statute, if the corroborating evidence, standing alone, tends to connect the defendant with the crime. "The corroboration of an accomplice's testimony, as has been said, may be slight, but it must in and of itself, and independent of the testimony of the accomplice, tend to inculpate the defendant on trial with the commission of the crime." (*People* v. *Coffey,* 161 Cal. 433 [39 L. R. A. (N. S.) 704, 119 Pac. 901].) Reading the instruction, therefore, as a whole we are of the opinion that it contains a correct statement of the law upon the subject of corroborating evidence, and is not subject to the criticism made against it by appellant.

[19] The court instructed the jury in the language of section 125 of the Penal Code. Appellant contends that this was error, and in support of this contention relies upon *People* v. *Von Tiedeman,* 120 Cal. 128 [52 Pac. 155]. In that action the court said: "This section of the code was given to the jury, and the application of the principle there declared to the facts of the case stated in various forms by the judge in his charge." After setting out a number of these "various forms" the court continues, "Such a construction of section 125 absolutely eliminates the whole question of criminal intent; and criminal intent is the vital element in every crime of perjury. . . . The court omitted to instruct the jury that this was an essential element of the crime; that, in order to find the defendant guilty of the crime charged, they must find that the statement which he was charged with having made was made by him "willfully.' " The court finally concludes that "Under the instructions given, the jury were at liberty to find the defendant guilty, even though they should find that the statement had been made by him in the honest belief that it was true." In the present action the court, in another instruction, told the jury that "The false testimony must have been corrupt

and willful, and ignorance of the true facts, inadvertence, or mistake, are not substitutes for willfulness or corruptness." This last-mentioned instruction supplied that which was lacking in the instructions in the case of *People* v. *Von Tiedeman, supra*, and rendered the giving of the instruction in the present action in the language of section 125 of the Penal Code, proper and free from error.

[20]   It was not error for the court to refuse the following instruction, requested by appellant: "You are instructed that a magistrate, in approving bail bonds, has a legal right to assume that the persons qualifying thereon are in truth and in fact the persons whom they purport and claim to be, when they appear before such magistrate to justify." Such an instruction could only have confused the jury. Besides it is not a correct statement of the law upon the subject. If this were the law, then John Doe and Richard Roe, two men well known personally to the magistrate, might qualify upon a bail bond as John Smith and William Jones, and it would be the legal right of the magistrate to assume that they were the persons whom they purported and claimed to be, even though the magistrate knew of his own knowledge that they were not such persons.   [21]   It is the duty of a magistrate, in accepting bail, to the very limit of his knowledge and in the exercise of the greatest care, to see that the bail bond he accepts is legal in form; that the sureties whose names are signed thereto are the persons they purport to be; and that they are able to respond to the full extent of the penalty thereof in case the principal fails to comply with the conditions of said bond. The magistrate accepting bail is the sole representative of the law, standing between the people of the state on one hand, and those accused of crime upon the other, and if he fails in his duty then efficient law enforcement is rendered impossible.

[22]   Neither did the court err in refusing to give an instruction, requested by appellant, that "Any committing magistrate may accept bail or approve bail bonds whether the person admitted to bail was so admitted by such committing magistrate or any other committing magistrate." We find nothing in the law of this state that would warrant the giving of such an instruction. On the other hand, the plain provisions of the Penal Code are directly opposed to any such promiscuous exercise of authority by magistrates.

Section 1277 of the Penal Code provides that "the admission to bail may be made by the magistrate by whom he is so held, or by any magistrate who has power to issue the writ of *habeas corpus*." Section 1280 provides that "The bail must in all cases justify by affidavit, taken before the magistrate," etc. And the provisions of section 1281 are that "Upon the allowance of bail and the execution of the undertaking, the magistrate must, if the defendant is in custody, make and sign an order for his discharge." From these sections of the code it is apparent that it is the intent of the law that the magistrate admitting the defendant to bail is the only one before whom the bail may justify, and the only magistrate authorized to make and sign the defendant's discharge upon the allowance of bail and the execution of the undertaking. It is true that there was evidence indicating that it was the practice among the township justices of Los Angeles township for any one of them to approve bail bonds, notwithstanding the fact that the justice approving the bond was not the committing magistrate in the proceeding in which the bond was given. Appellant was not only permitted to offer evidence tending to prove this fact, but the court instructed the jury that if they should find that such a practice existed, that they might take that into consideration as going to the matter of intent of the appellant in approving bonds in actions in which he was not the committing magistrate. In our opinion, the court was as favorable to the appellant in its instructions upon this phase of the action as he could reasonably ask or expect.

Numerous other assignments of error were contained in the record and exhaustive arguments in support thereof are presented by appellant in both his opening and closing briefs. Many of these assignments go to the action of the court in refusing to instruct the jury as requested by appellant, and the others are based upon the court's rulings in giving certain instructions proposed by the prosecution. We have carefully considered the arguments advanced by appellant in support of these alleged errors, but are not convinced that appellant has sustained any substantial injury by the rulings of the court in these matters.

The only question remaining for decision is whether the error of the court in permitting the prosecution to cross-examine the witness Hervey, by reading to him portions of

his testimony given before the grand jury, was of such a nature as would justify this court in reversing the judgment herein. If appellant really had the conversation with Rollins which he claims to have had, in which the latter told him that the money would be left at the drugstore, it would not be unreasonable to suppose that Rollins might have informed him in this conversation as to the kind of a package in which the money would be found. And if Rollins so informed appellant, it would not be anything strange or unreasonable for appellant to have given Hervey the same information that he received from Rollins. Therefore, proof of these facts would not have materially injured appellant. While it must be admitted that this manner of sending money is somewhat unusual and out of the ordinary, there was nothing criminal in the mere fact that the money was left in a package with a loaf of bread, any more than if it had been left in a leather pocket-book. But appellant had testified before the grand jury that he did not know the size, kind or character of the package in which the money was left, and later at the trial he testified that he did not know that it was wrapped in a package with a loaf of bread, and furthermore, that he did not tell Hervey that he would find it in a package with a loaf of bread. Taken, therefore, in connection with the testimony of the appellant, the testimony given by Hervey before the grand jury was directly contradictory to the testimony of appellant at the trial. In itself it was of slight moment and did not prove directly any of the assignments of perjury set out in the information, but as testimony contradictory to that given by appellant, its importance and materiality was greatly enhanced, and accordingly the injury to appellant in having it improperly brought before the trial jury was correspondingly augmented.

Notwithstanding this error and its consequent injury to appellant's case, we are not prepared to say that this court is justified or even authorized to reverse the judgment by reason of such error. Eliminating this improper evidence given by Hervey entirely from the record, it remains highly improbable that the jury would have rendered any other verdict than that of guilty. With this evidence out of the case entirely, there was still remaining the testimony of Lindquist that he knew of no person by the name of Rollins

and that he had no conversation with appellant about Rollins, or anyone else, in reference to assisting him to raise bail money; there is also the evidence of the Pelton Apartment House owners and their employees that there was no such person as Rollins stopping at the apartment house at the time appellant states he phoned Rollins regarding bail money for Lindquist; also that of Hervey that appellant told him that the money was left at the drugstore for "George Allen or Ruth Allen," and the admission of this fact by the appellant himself; and that of the drugstore attendants that the money was left there by a man who wrote on a card "George Allen or Ruth Allen" and left it with the package; and finally the testimony of the handwriting expert that the handwriting on this card was that of appellant. While this evidence was not without contradiction, yet the jury must have believed it in order to have rendered a verdict of conviction, and we are unable to perceive how their view of this evidence would have been materially, if at all, different, had the examination of Hervey been confined within proper limits. The error was not, therefore, of such a nature as would justify a reversal of the judgment.

The judgment and order denying appellant's motion for a new trial are affirmed.

Conrey, P. J., and Hahn, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 22, 1926.

Lennon, J., dissented.