[Crim. No. 1026.   Fourth Dist.   Sept. 22, 1955.]

THE PEOPLE, Respondent, v. CHARLES LYON et al., Appellants.

Leo V. Silverstein, Charles E. Burch, Jr., Thomas Whelan, Procopio, Price, Cory & Schwartz and Z. B. West for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), Jack R. Levitt and Barton J. Sheela, Jr., Deputy District Attorneys, for Respondent.

GRIFFIN, J.—By an amended indictment (hereinafter referred to as indictment) appellants Charles Lyon and Louis Trapani, together with defendant Frank Bompensiero and certain John Does and certain alleged unindicted coconspirators Charles Berry, Harry Steetle, and Al Bennett, were charged in Count I with the crime of conspiracy to commit the crime of asking or receiving bribes on behalf of a public officer, to wit, Charles Berry, an executive officer of the State of California (District Liquor Control Officer of the State Board of Equalization).

Eight overt acts, claimed to have taken place in San Diego County in furtherance of the conspiracy, are set forth, i.e., (1) that appellant Lyon called one Patterson on the telephone on January 20, 1953; (2) that he instructed Patterson to make an application for an on-sale general liquor license about November 16, 1952; (3) that on January 20, 1953, he instructed Patterson to bring him $7,000; (4) that appellant Trapani, about August 23, 1952, instructed the Ghio brothers to collect $7,500; (5) that about October 10, 1952, Trapani instructed them to apply for an on-sale general liquor license; (6) that defendant Bompensiero, about February 27, 1951, instructed one Gillenberg to apply for a seasonal liquor license; (7) that about October 25, 1952, defendant Bennett instructed one Gillenberg to obtain $2,500; and (8) that about December 15, 1952, Trapani instructed one Shoenbeck to gather together $7,000.

Counts II, IV, VI and VIII allege the crimes of attempted grand theft or grand theft. Count II against Lyon is designated as the Patterson transaction; Count IV against Trapani, the Bernardini transaction; Count VI against Trapani, the Ghio transaction; and Count VIII against Trapani, the Shoenbeck transaction, on which counts they were found not guilty. Count III charges appellant Lyon, defendant Berry, as executive officer, and John Does One to Five, of the crime of asking, receiving and agreeing to receive a bribe by a public officer (Pen. Code, § 68) on or about January 20, 1953 (Patterson transaction). Count V charges appellant Trapani, certain John Does and defendant Berry, with the same crime, involving $7,000 (Bernardini transaction) as having occurred on November 1, 1952. In Count VII it was similarly charged that on August 23, 1952, they asked, received, and agreed to receive a bribe of $7,500 (Ghio transaction). In Count IX they were similarly charged (Shoenbeck transaction), involv-

ing $7,000. In Count X defendants Bompensiero, Bennett and Berry were similarly charged with violating section 68 of the Penal Code (involving $5,000—Gillenberg transaction) on April 3, 1951. In Count XI they were similarly charged ($2,500—Gillenberg transaction) and that it occurred on October 25, 1952.

Defendants were duly arraigned, motions to set aside indictments, to dismiss the charges, and to have separate trials, were denied, and demurrers to the indictment were overruled. The action proceeded to trial against all defendants named except Bompensiero. His motion to set aside the indictment was undetermined at that time (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178 [281 P.2d 250]). A jury trial resulted in a verdict of guilty as to appellant Lyon on Counts I and III; guilty as to appellant Trapani on Counts I, V, VII and IX; guilty as to appellant Bennett only on Count XI; and guilty as to defendant Berry on Counts III, V, VII, IX and XI.

Defendant Berry's appeal, through his attorney, has heretofore been dismissed. Motions for new trial, arrest of judgment, application for bail pending appeal, and for stay of execution, were all denied. Prison sentences and fines were imposed.

The evidence, as gleaned from a record of eight volumes consuming 1,985 pages of reporter's transcript, shows certain facts that are applicable to all the counts upon which appellants have been convicted. There were two types of liquor licenses issued by the State Board of Equalization and handled by defendant Berry which are material to the facts of this case. The first type is the on-sale general liquor license. For its issuance the state required the payment of a $525 fee for premises that lay in an incorporated city and a $325 fee if the premises were located in an unincorporated area of the county. The evidence shows that on-sale general liquor licenses were transferable; that as soon as they were issued to the license holder they had a value of from $12,000 to $12,500 on the resale market during the fall of 1952 and early part of 1953, and a value of approximately $7,500 on the resale market during the fall of 1953 and early part of 1954. The evidence further shows that there was a restriction on the issuance of these licenses, in that no more than one license of this type could be issued for each one thousand persons in the county. The other type of license was the seasonal cocktail license, which could be issued at any time,

whether the population limits on general licenses had been exceeded or not, and were not transferable and had no resale value. The uncontradicted evidence is that only defendant Berry could say whether or not a given individual would be allowed to apply for a general or seasonal liquor license in his district. It further shows that in no instance during Berry's regime in San Diego was a person who had been allowed to file a formal application for a liquor license ever denied a license by the State Board of Equalization; that prior to Berry's coming to San Diego in 1948, the official records of the Board of Equalization show that there was a different practice, in that applications were issued to more people than were granted licenses. (For a further recitation of the nature of the charges and surrounding circumstances see *People* v. *Bennett,* 132 Cal.App.2d 569, 571, 572 [282 P.2d 590].)

The following is a summary of the evidence applicable to Count I charging one general conspiracy, i. e., conspiring to commit the crime of asking or receiving bribes by a public officer, upon an understanding and agreement that the vote, opinion or action upon matters which would be brought before Berry in his official capacity as an executive officer of the state would be influenced thereby. This count involved defendant Berry and appellants Lyon and Trapani.

One Harold Dodds testified that in 1953 he learned that on-sale general liquor licenses were available and that he wrote a letter to the State Board of Equalization asking for permission to apply; that in answer to his letter he received a preliminary application form which he executed in return; that shortly thereafter he received a visit from coconspirator Steetle, who had no official connection with the board, and he informed Dodds that he might be able to obtain one of these new on-sale general liquor licenses but that in order to do so he would have to pay $4,500 in cash; that thereafter Dodds went to the office of Steetle, who was associated as a business opportunity broker with appellant Bennett, with offices adjacent to the offices of the board, and upon arriving there he talked with appellant Bennett who told him he could pay for his liquor license by paying $3,500 in cash and a promissory note for $1,000; that they agreed to this and Bennett picked up the telephone and called a number, saying to the party he called: "I'm sending Harold over"; that Bennett then instructed Dodds to go to the board's office to make application for a liquor license; that he walked next

door and was ushered into the office of defendant Berry; that on arriving there he saw his application form on Berry's desk; that after a brief discussion Berry allowed Dodds to file his formal application for a liquor license and shortly thereafter he received an on-sale general liquor license.

As to the nature and extent of this claimed general conspiracy, one Gillenberg testified that during the years 1950, 1951 and 1952, he operated a café in Jacumba; that he wanted to obtain an on-sale general liquor license; that he made application for the same to the San Diego office of the board; that he was then denied the right to make such application; that he was later contacted by an unidentified public relations man from Long Beach who told him he could obtain a seasonal liquor license for $5,000 cash and that several months later Ira Provart, the liquor control officer who administered the El Centro office of the board for Berry, told him he could obtain a seasonal license; that Gillenberg quibbled on the price and that later someone giving the name of "Frank B" came to see him; that he later learned his name was Frank Bompensiero, an alleged coconspirator in this case; that "Frank B" told him he could obtain a seasonal license but it would cost $5,000 in cash; that he should see Provart in the El Centro office; and that on February 27, 1951, he went to see Provart, made out his application and waited several weeks hoping his license would be issued without the illegal payment of $5,000. He testified that he then received a telephone call from someone telling him to meet "Frank B" in the lobby of the Grant Hotel in San Diego and pay the $5,000; and that he went to San Diego, but rather than pay it in cash, he obtained a cashier's check made out to himself. This check was introduced in evidence. It showed the endorsement of Gillenberg on the reverse side and showed that it was cashed with the endorsement of Frank Bompensiero.

Gillenberg testified that after obtaining the check and after much discussion with Bompensiero he agreed to accept the check instead of cash; that Bompensiero told him after he had operated under his seasonal license for one year he should apply for an on-sale general liquor license and that it would be given to him; that he waited one year and then tried to make out an application for a general liquor license, but was turned down by the board; that shortly thereafter appellant Bennett contacted him on October 25, 1952, and told him he would have to pay an additional $2,500 if he wanted to replace the seasonal license with an on-sale general license; that Gillen-

berg told Bennett about the understanding he had with Bompensiero and Bennett told him that he (Bennett) handled the majority of the licenses in San Diego and that it would still cost him $2,500 if he wanted the on-sale general liquor license; and that he would not accept a check. He then testified that he obtained the cash from his bank that day and gave it to Bennett.

Provart testified that during the year 1951 he was liquor control officer working under defendant Berry in El Centro; that he had several discussions with Gillenberg and Gillenberg indicated he wanted a cocktail license; that he discussed this matter with defendant Berry who informed him that Gillenberg could obtain a seasonal license but that $5,000 would have to be paid. Provart then testified that Gillenberg only wanted to pay $3,500 for the license and he relayed this information to Berry, who indicated he would have Bompensiero contact Gillenberg about it; that later Gillenberg came into the El Centro office and explained to him that Frank had been to see him and that he was there to make his application for a seasonal license. This application was executed by Provart on February 27, 1951. He then testified that sometime thereafter he met Bompensiero in San Diego and Bompensiero told him that he had met with Gillenberg in the Grant Hotel and indicated that Gillenberg had not brought cash money but had given him a check; that later on Berry gave Provart $400 saying "This is your cut of the Gillenberg deal"; that when the matter was originally discussed between him and Berry, Berry indicated that the money had to be cut up ten or eleven ways and that there would not be much, if anything, for Provart.

Gillenberg's testimony shows that after paying Bennett the $2,500 on October 25, 1952, on November 3, 1952, he was allowed to apply for an on-sale general liquor license which was issued to him shortly thereafter; that some two or three months prior to the trial of the action Gillenberg had been contacted by representatives of the attorney general's office and he told them the details of his liquor license transactions; that Bennett, a day or so after the men had interviewed Gillenberg, came out and asked him if he had told them anything and he replied that he had told them everything he knew about the deals and that Bennett suggested he see Mr. Whelan, attorney for defendants Bennett and Steetle; that he did so; and that Whelan suggested he see his own attorney inasmuch as he was already representing Bennett. For further

particulars in reference to the factual background surrounding this transaction see statement of facts in *People* v. *Bennett, supra,* p. 573; and *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 180 [281 P.2d 250].

One Tossas, who did some campaign work for one Cook who he said he knew was one of the campaign managers for William G. Bonnelli, member of the Fourth District Board of Equalization in the 1950 campaign, testified that Cook instructed him, in detail, as to whom he was to contact for contributions, and that later in the year Cook asked Tossas to check several locations in San Diego, Orange and San Bernardino Counties to see whether or not these locations qualified for the issuance of seasonal licenses; that Cook told Tossas the purpose of this check was to see whether or not such licenses could be issued without too much objection; that he inspected premises in San Diego County and was instructed to pick up $5,000 from Dana Villa, in Orange County, which place was later issued a seasonal cocktail license, and a place in San Bernardino County; that he was also instructed to inform a liquor licensee whose name was unknown to him that this person could obtain a seasonal license for the payment of $5,000; that when he made a pickup of the money for these seasonal licenses he was to hand the money to Cook and that Cook explained they were issuing these seasonal licenses in exchange for the $5,000; that this money was to be used to pay accumulated bills and expenses, and also to pay the "workers"; that he carried sealed envelopes between Cook and defendant Berry during the campaign; that he was informed by Cook, when he asked what was in the envelopes, to mind his own business; and that when he was making representations to these people as to the payment of money to obtain seasonal licenses, he represented that they were not transferable but could be converted into general on-sale liquor licenses which were transferable. A similar seasonal license transaction was also negotiated by appellants Trapani and Bennett.

Further evidence connecting appellants Lyon and Trapani with Count I (conspiracy count) is the testimony of certain witnesses bearing on Count III (Patterson transaction, pertaining to appellant Lyon) and Counts V (Bernardini transaction), VII (Ghio transaction) and IX (Shoenbeck transaction), involving appellant Trapani. It appears that one Harry Patterson, who operated a small café in San Diego, desired to obtain a cocktail license. He previously had a

wine and beer license. He was acquainted with one Abbott, a long-time friend of appellant Charles Lyon. Abbott called Lyon by telephone from Patterson's place of business and told him of his acquaintance with Patterson and said that Patterson was anxious to obtain a liquor license; that he had applied for such a license and was told the "list was full" and wanted to know if Lyon did not know someone in the department and asked if he would do something for Patterson. Lyon inquired about the place and Abbott recommended it. Lyon suggested Patterson go to Los Angeles and meet him at the office address given by Lyon. A date was fixed for that purpose. Patterson testified generally that he and his wife went to Lyon's office in the early part of November, 1952; that Lyon told him he could obtain a license for Patterson for $8,000; that "It would have to be kept under cover"; and that the money must be paid in cash (apparently Patterson accepted the deal); that appellant Lyon then told Patterson to report to defendant Berry immediately on his return to San Diego and apply for the seasonal license; that he did this and talked with Berry in person; that Berry inquired of him as to how long he had known appellant Lyon and he told him he had just met him; that Berry said he (Lyon) "was one of the best friends that a man ever had"; and that shortly thereafter he received the license. The license in evidence indicates it was issued in Sacramento on December 19, 1952. Patterson then testified that the day before Christmas he drew out $1,000 in $100 bills from his account in the bank; that he took it to appellant Lyon and delivered it to him in his office in Los Angeles, in a brown envelope, between 11 and 12 a. m.; that Lyon wanted to know when he could expect the balance and told him when he brought it in to bring cash in a sealed plain envelope and leave it with his secretary if he was not in at the time. Patterson said he "possibly" asked Lyon for a receipt for his $1,000 but Lyon said "it could not be done" and that appellant Lyon never mentioned anything to him about charging any reasonable fee for attorney's fees for his service. It appears that Patterson paid nothing further on the account and that thereafter, about the middle of January, 1953, appellant Lyon came to Patterson's place of business in San Diego and asked him for the balance of $7,000; that Patterson told him he would be up soon, but nothing was paid on it at that time; that Lyon subsequently telephoned Patterson from Los Angeles and asked for the balance of the money and told him that "Mr. Bonnelli was

getting impatient because he didn't bring him the rest of the money''; that someone identifying herself as defendant Lyon's secretary, telephoned him from Los Angeles on two occasions and asked him to bring the balance of the money to Los Angeles but that he did not do so. Sometime in the middle of January, 1953, Patterson sold the license in question to appellant Bennett for $5,000, for the claimed reason that it would involve some possible breach of his lease if he operated under it on those premises. He refused to pay Lyon any more money. When an investigation took place certain witnesses testified before the grand jury in reference to the manner in which their licenses were obtained. Immunity from prosecution was offered to Patterson and the witnesses there testifying.

At the trial Mrs. Patterson testified about the trip to appellant Lyon's office. She said she could not relate the conversation that was had between Patterson and Lyon, but she did remember appellant Lyon coming to their place of business in San Diego, although she could not remember whether it was in November, 1952, or later, but she thought it was in November.

The State Department of Justice agents subsequently made investigation in reference to the issuance of liquor licenses in this district. Appellant Lyon was questioned in his office in Los Angeles about the Patterson license, and he told them there was no fee involved and he had not asked Patterson for a fee; that he was told of Patterson through his friend Abbott but nothing was said by Abbott as to the nature of Patterson's business; that Patterson came to his office a few days later and told him that if he could obtain a general on-sale liquor license it would be worth in the vicinity of seven to eight thousand dollars; that he told Patterson he saw no reason why he should not be able to obtain one, and to again make application to the Board of Equalization in San Diego and he would personally go to San Diego and inspect Patterson's premises; that by chance he met defendant Berry the next day in Los Angeles and told him he had a friend and client by the name of Patterson applying for a license; that Berry told Lyon to send him in; that the following week he went to San Diego and examined Patterson's premises and made certain suggestions about improvements; that he heard nothing further until about two weeks later when Patterson came to his office and gave him $1,000; that he asked if it was a fee Patterson was giving him, although no

fee had ever been discussed between them; that Patterson told him at that time that more money would be forthcoming; that he was a little surprised because he thought the $1,000 payment was a rather ample fee; and that subsequently he called Patterson on the telephone, came to San Diego, and ascertained that Patterson was ill so he could not see him.

Later, in the office of the district attorney in San Diego, Lyon said he had made some error in reference to dates in his previous conversation and wanted to straighten them out; that Abbott did tell him the nature of Patterson's visit and that in Los Angeles he did tell Patterson he would charge a fee in the event he was able to give him assistance in obtaining the license; that Patterson did obtain a license and he called him to tell him the number of it and later asked him to come to Los Angeles and give him some money, but no amount was mentioned; that his secretary later called about it and it was not until March or April, 1953, that Patterson paid the $1,000; and that he gave no receipt for the money because it was not his practice to do so.

Appellant Lyon's testimony before the grand jury was received in evidence. There he reiterated his story and said he visited Patterson's premises in San Diego after his first visit to Lyon's office in Los Angeles; that the next day he telephoned to Berry and told him he would appreciate it if he would look at Patterson's contemplated improvements to his place of business in connection with the application he had filed or was about to file; that he never made any agreement with Patterson as to fees but told him he expected to be paid a reasonable fee in case a license was issued; that within a month or two Patterson obtained the license and came up and thanked him for his work and paid him $1,000 in cash and went on his way; that he never called him about any further payment after he paid the $1,000; that he used it in the ordinary course of business and did not give any of it to anyone else; that this was the first time he "remembered he ever took any interest in anything of that kind and only did it because of Abbott''; that he had his secretary call Patterson the last part of February, 1953, just to see how Patterson's health was at a time when he was attending the legislative session; and that he did not know whether the $1,000 attorney's fee was reported in his income tax return.

Thereafter, over objections, the prosecution presented one George Joe, café and bar owner in San Diego, who testified he tried to obtain a license and put in an application for it

early in 1946, before Berry came to the San Diego office, but he was unable to obtain one; that he went to see appellant Charles Lyon at his office in Los Angeles but Lyon told him it would take $8,000 for attorneys' fees; that he paid him $2,000 down in cash and received the license in April, 1946, and later he paid him $4,000 in smaller amounts.

Lyon's secretary testified at the trial that she called Patterson at Lyon's request, on at least one occasion during January or February, 1953, advising Patterson that Mr. Lyon would be in his office on a certain date and asked that Patterson come to see him at that time; that although this transaction resulted in the payment of a legal fee of $1,000, no office file was kept on the transaction. A check for $1,000, whereby Patterson drew this amount from his account in the bank, was received in evidence. It was marked paid December 24, 1952. Appellant Lyon's claim is that this money was withdrawn on that day, and since the bank did not open until 10 a. m. it would be impossible for Patterson to drive to Los Angeles with it and meet him between 11 and 12 a. m., and therefore the testimony of the witness Patterson was improbable. The evidence showed that the check could have been cashed any time after 9 :30 a. m. Since Lyon admitted receiving the $1,000 sometime after December 19th, when the license was issued, we see no particular point in further discussing it. Appellant Lyon did not choose to testify in his own behalf at the trial. Character witnesses of some import testified as to his good reputation.

Further evidence was produced by the prosecution as bearing on Count I, and as applicable to the other defendants charged. One Bernardini testified that he had tried on several occasions to obtain an on-sale general liquor license for his restaurant; that one Cottardo Ghio, a friend of his, introduced him to appellant Trapani shortly after Ghio had acquired an on-sale general liquor license; that Trapani told him that he could obtain an on-sale general liquor license for him if he, Bernardini, would pay $7,000 in cash; that upon advice of his attorney and his father he refused to pay the money and he never received the liquor license.

Cottardo Ghio testified that he and his brother A. Ghio tried to make an application for a general license through defendant Berry and that he refused to accept it; that he later contacted appellant Trapani, a friend of the family, and that Trapani informed him that in San Diego it would cost him $7,500 in cash to obtain a new general liquor license; that on August

23, 1952, appellant Trapani called him and instructed him to bring the money to Capistrano; that on the 25th of August he and his brother delivered $7,500 in cash to Trapani, and were instructed to make their application to defendant Berry; that Berry refused it again; that after a second refusal he called Trapani and asked him what he should do and Trapani said: "He got his, what is he waiting for"; and Trapani then called him and told him to "stand by"; that later he received a telephone call from the Board of Equalization telling him to come up and make an application; that after this application was filled out, a liquor license was issued to his premises. This testimony was corroborated by two other witnesses.

One R. Shoenbeck testified that he tried without avail to obtain an on-sale general license from the board; that he was later contacted by appellant Trapani, who agreed to obtain one for him for $7,000 on December 15, 1952; that an installment payment plan was agreed upon; that he paid the first payment of $2,500 to Trapani and was instructed to make his application to defendant Berry; that Berry permitted him to make his application; that the liquor license was issued and that during the early part of 1954 Shoenbeck completed paying the balance of $7,000 to Trapani.

In addition, considerable evidence was introduced of similar transactions and among them were some which directly involved defendant Berry. One Silva testified that in 1949 appellant Bennett came to see him about a seasonal license; that after he had applied for but had been refused a general on-sale license, he was told by appellant Bennett that a seasonal license could be obtained for $5,000, and thereafter he could obtain a regular license for an additional $2,500; that he paid $1,000 down and the rest in monthly payments; that when all payments were made he went to see Berry and obtained a seasonal license, operated under it for about two years, and then gave Bennett $2,500 and received a general license.

One Jacobs, restaurant owner, testified he had a seasonal license; that he talked to defendant Berry on many occasions about a regular license, but was unable to obtain one; that later Berry told him one would cost between three and four thousand dollars; that in 1952 he applied for one; that in Berry's presence he paid the state fee of $325, left $500 in cash in his desk drawer, and obtained the license; that he subsequently left $500 in cash in the same fashion; and that he

was later injured and Mr. Berry told him to forget about the balance.

One Burkhart testified he contacted appellant Trapani about a license for one McClure at Dana Villa, in Orange County; that he was told by Trapani to have McClure apply at a certain time for the license and to charge McClure $2,000; that he picked up the money from McClure; and about one month later Trapani gave Burkhart $200 back for his part in the transaction.

McClure testified he paid one Tossas $5,500 for a seasonal license and that Burkhart said he thought he could obtain a general license for him for $2,000 more; that he gave him $2,000 in small bills and two weeks later he applied for a general license and obtained it.

Appellant Trapani, at the trial, testified generally that he had known Bernardini and the Ghio family for many years; that Cottardo Ghio spoke to him about obtaining a general license; that he told Bernardini he thought the board was issuing additional licenses soon; and that he told Ghio he could buy one for around $14,000 on the market but that he could obtain one of the new ones for around $7,500; that Ghio was willing to donate the $7,500 to the "public relations" fund for promotion of interests of the liquor industry, if he would assist him in obtaining one; that Ghio brought the $7,500 up to Capistrano and gave it to him; that he then told Ghio to go to the board and make application; that he was told by Ghio that Berry said he knew nothing about it and he told Ghio to go down there and "demand his rights," but he denied saying "He has got his, what is he waiting for"; that he discussed with Bernardini the propriety of obtaining a general license, but he (Trapani) suddenly looked up and saw a church near-by and told Bernardini there was no use talking about it because it was too close to his premises, and so he left; that he met Shoenbeck in Los Angeles at the airport; that Shoenbeck said he was willing to contribute to the "relations fund"; that no amount was mentioned but Shoenbeck offered $7,000 and he subsequently took it for that fund after Shoenbeck had obtained his license; that he never met Berry until they met in the courtroom; that he received some money from Burkhart in reference to recommending the McClure license, and also $5,500 on a time-basis plan, from one Dangeli as a contribution to this "relations fund"; that he received a similar contribution of $7,500 from one Colby, and turned it all into the "relations fund" except such amount

as he used for his own expenses; that this money was turned over to a Mr. Granas, to whom he made all of his recommendations in reference to the issuance of licenses; that he knew defendant Bompensiero but never knew any of the other defendants here charged.

One Larry Imig testified that defendant Berry asked him to pay a Mr. Goldfarb $7,000 as a condition precedent to obtaining a general on-sale liquor license for a La Jolla hotel. Goldfarb testified that the $7,000 he received from Imig and the $7,000 he received from a Mr. Vallin for a similar license were turned over to Berry, at Berry's request.

There was considerable other evidence applicable to all counts which shows a common scheme or design between Berry and the three appellants. Appellants admit that there was evidence as above summarized but contend that, for various reasons, the evidence was insufficient to support the verdicts.

With respect to the first (conspiracy) count, involving Lyon and Trapani, it is argued that the only circumstances from which a conspiracy could be inferred are those appearing in the testimony adduced; that this testimony is deficient in that it fails to show any general conspiracy but shows several conspiracies between one particular person and defendant Berry, with which the remaining appellants were not connected, and it follows that the testimony of some of the witnesses was therefore hearsay and inadmissible against them.

All appellants cite, with considerable force and with some merit, the holding in *Kotteakos* v. *United States,* 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557]; and *Canella* v. *United States,* 157 F.2d 470. They claim that under the facts there related, the evidence showed not one general conspiracy but a number of conspiracies executed through a common key figure, and that accordingly the error of "mass trial" resulted in a miscarriage of justice in permitting all of the evidence as to other alleged conspiracies to be introduced against each defendant so charged. The claim is that in the instant case the acts and declarations of confederates, past or future, are never competent against a party except insofar as they are steps in furtherance of a purpose common to him and them, and that declarations become competent only when they are uttered in order to accomplish a common purpose.

In the instant case only one conspiracy was charged, and the court and jury were justified in believing that each of the transactions disclosed by the testimony was a part of a single general conspiracy to ask or receive bribes in connection with

the issuance or proposed issuance of such liquor licenses. For all practical purposes this same argument was made before our Supreme Court in the Bompensiero case, *supra,* and was by it rejected. The court there said, at page 184:

"The evidence before the Grand Jury presents a close question as to whether it shows probable cause to believe a general conspiracy existed and that Bompensiero was a part of it. The similarity of manner in which contact was made with the restaurant owners and the bribery accomplished tends strongly to suggest a common plan of participation, although that evidence alone probably would not show Bompensiero's connection with it. However, Berry's discussion with Provart concerning the advisability of having Bompensiero 'talk to' Gillenberg suggests some reason to suppose he would agree to do so, possibly because he had acted in a similar capacity previously. Bompensiero's statement to Gillenberg in regard to the issuance of a general license after a year implies knowledge of the manner in which Berry and his associates generally operated. Also, in each case the bribe given for a general license was either $7,000 or $7,500; the requirement that Gillenberg pay an additional $2,500 for the general license after paying $5,000 for the seasonal one, was consistent with this pattern.

"The rule governing the sufficiency of the evidence to justify a suspicion of a conspiracy has been summarized as follows: 'Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. "[I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole." '. . . The Grand Jury was justified in the belief that each of the transactions in which a bribe was accepted was part of a single general conspiracy to invoke a bribe for each new liquor license issued throughout the district."

(See also *People* v. *Bennett, supra.*) In the instant case there was considerably more evidence produced in this respect than was before the Supreme Court in the Bompensiero case. Accordingly, it must be held here that there was sufficient

evidence of a general conspiracy to submit the question to the jury under proper instructions.

A question is raised as to whether the jury was properly instructed in this respect. ■ The trial court refused two instructions offered by appellant Lyon (31 and 32) to the effect that if the jury found from the evidence that several conspiracies, and not one conspiracy, are endeavored to be proven by the prosecution as to count I, it must acquit appellant Lyon. The trial court properly instructed the jury in which he defined a conspiracy as being an agreement or criminal partnership, the design and object of which is to do an unlawful act or a series of unlawful acts accompanied by an overt act to effect the object of such agreement; that where a criminal conspiracy has been formed, each of the persons forming the same, while he is a member thereof, is liable for every act, and is bound by the act and declaration of each and all of the conspirators, done or made in pursuance and furtherance of said conspiracy; that no evidence of an act or declaration of an alleged conspirator shall be binding upon or be considered against any other alleged conspirator unless and until, independent and without the aid of such evidence, a "conspiracy as alleged," and of which both such persons were members, has been proved to have been in existence at the time of such act or declaration; and no alleged conspirator shall be held criminally responsible as such for any act of another alleged conspirator when the only substantial evidence purporting to indicate an agreement between them is evidence of the act and declarations of the latter; that no act or declaration of a conspirator that is a fresh and independent product of his own mind and is outside the common design and not in furtherance of that design is binding upon his coconspirators, and they are not criminally liable for any such act or declaration.

In view of the instructions given on the subject, the refusal of the court to give the proffered instruction was not prejudicial error. (*People* v. *Rodriquez,* 31 Cal.App.2d 524 [88 P.2d 217].)

Appellant Lyon, as well as the other appellants, contend that there was no evidence corroborating the testimony of the claimed accomplices, and accordingly the evidence was insufficient to support the verdict. Apparently, the judge found himself confused as to whether the "givers of the alleged bribes" were accomplices, particularly under the substantive counts. At the beginning of the trial he endeavored to limit the testi-

mony respecting each coconspirator to that particular defendant involved until evidence respecting the other coconspirators came in, and he so instructed the jury at that time. Thereafter, he decided he was unable to sufficiently explain to the jury the limitation, and allowed the testimony to apply to all counts. He then instructed the jury that all claimed givers of bribes were, as to Count I (the conspiracy count) accomplices, with the possible exception of Bernardini. Further in his instructions to the jurors, he informed them that as to the remaining counts the jury should determine as a factual matter whether they were accomplices, and he read section 1111 of the Penal Code defining accomplices. He informed them that it was necessary to corroborate such testimony.

It has been established that where a bribe is solicited the victim is not an offender and cannot be considered an accomplice of the person seeking the bribe. (*People* v. *Ruef*, 14 Cal.App. 576 [114 P. 48, 54]; *People* v. *Powell*, 50 Cal.App. 436 [195 P. 456]; *People* v. *Brigham*, 72 Cal.App.2d 1 [163 P.2d 891]; 9 Cal.Jur.2d 76, § 23.) With the possible exception of the conspiracy count, appellants cannot be heard to complain if the court left that question for the jury to determine. (*People* v. *Coffey*, 161 Cal. 433 [119 P. 901, 39 L.R.A.N.S. 704]; *People* v. *Bunkers*, 2 Cal.App. 197 [84 P. 364, 370]; 4 Cal.Jur. 512, § 23.) As to Count I it may be reasonably questioned as to whether such persons would be accomplices as a matter of law. (*People* v. *Buffum*, 40 Cal.2d 709 [256 P.2d 317]; *People* v. *Gallardo*, 41 Cal.2d 57 [257 P.2d 29]; *People* v. *Stevens*, 78 Cal.App. 395, 406 [248 P. 696]; *People* v. *Keyes*, 103 Cal.App. 624, 646 [284 P. 1096].) Conceding for the purpose of argument that they were, as instructed by the court, there is other sufficient evidence of corroboration tending to connect each appellant with the commission of the offense charged. As to appellant Lyon, Patterson directly involved this defendant. His testimony was corroborated by the witness Abbott, who was not an accomplice, even though the trial court branded him as such, and by Patterson's wife, who accompanied him to Los Angeles, where the proposition was submitted. There is additional evidence concerning the application form filed with defendant Berry, and that $1,000 was withdrawn from Patterson's account at the time related. Before the grand jury and before other witnesses defendant Lyon admitted receiving the $1,000. About the only variance is the purpose for which it was received. Defendant Trapani on the witness stand corroborated to a great degree the testi-

mony of the witnesses who testified against him in respect to the receipt of money by him. About the only difference in their testimony is the purpose for which the money was received.

A further contention made by appellant Lyon is that the evidence is insufficient to show that on or about January 20, 1953, he committed the offense charged in Count III, i. e., aiding and abetting Berry in asking and receiving a bribe from Patterson as charged. The claim is that the license was issued on December 19, 1952; that therefore, on the date charged, January 20, 1953, Berry could not have been influenced in any manner by his vote or action; and that accordingly the prosecution was bound by the date charged, citing such authority as *People* v. *Lips,* 59 Cal.App. 381, 388 [211 P. 22]. The evidence as to the date when the $1,000 was admittedly paid to Lyon is in conflict. Patterson fixed the date as of December 24th, when the money was withdrawn from his account. Lyon fixed it at a subsequent date and then changed it to another date. The gist of the charge was that *on or about* that date he did the acts charged. Apparently the alleged agreement was made prior to the time the license was issued. According to Lyon's testimony before the grand jury he telephoned Berry in San Diego and told him about receiving Patterson and asked him to look over his plans. Accordingly, Patterson then made application for the license involved and it was subsequently issued. The fact that there was a delay in payment, or that payment was to be made in the future, is not necessarily material to the issues. The making of the original agreement, the payment of the $1,000, the making of the application, and solicitation of the balance due are part of the same transaction. Appellant could not claim that he was deceived or prejudiced by charging that the act was committed on or about January 20, 1953. (Pen. Code, § 955; *People* v. *Sheffield,* 9 Cal.App. 130 [98 P. 67]; 14 Cal. Jur. p. 42, § 30.)

It is next argued that all evidence received as to counts other than Count III was inadmissible against appellant Lyon on that count. For a time during the trial the judge attempted to limit the application of that evidence, when it was received, to the count to which it was applicable, until it was shown that appellant Lyon had some connection with it. Thereafter, he ruled that the evidence was admissible as to all "sub-

stantive counts.'' Appellants Trapani and Bennett also claimed error in this respect and argue that without the aid of this claimed inadmissible testimony against them, these appellants would not have been convicted. Apparently the trial judge became confused and believed it would also have confused the jury if he attempted to explain to it what portion of the testimony would be applicable to each particular defendant and what portion could be considered against them as distinguished from that which was applicable to the conspiracy count. It may be readily seen how the judge may have become involved in such an endeavor.

It is true that in trying a person charged with one offense it is ordinarily not permissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged. But whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion. The general test of the admissibility of evidence in a criminal case is, does it tend logically, naturally, and by reasonable inference, to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not. The relevance of evidence that proves a crime other than that charged, however, must be examined with care. Since defendant Berry's conviction was based on the theory that it was part of a scheme to exact money for payment in influencing his actions, proof of such a scheme was essential to. the prosecution's case. Evidence concerning another offense is relevant to prove the execution of a scheme when in the light of the circumstances of the crime sought to be proved, it indicates the existence of such a scheme. When a defendant's conduct in connection with a previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design. (*People* v. *Peete*, 28 Cal.2d 306, at pages 315, 316 and 317 [169 P.2d 924].)

It should be here noted that appellant Lyon, as well

as the other appellants, were charged with aiding and abetting defendant Berry in asking and receiving the bribes involved. Accordingly, all the evidence pertaining thereto was admissible against Berry, the principal, either directly or to show system, scheme, plan or design to accept bribes for the purposes indicated. (*People* v. *Ruef*, 14 Cal.App. 576 [114 P. 48, 54]; *People* v. *Anderson*, 75 Cal.App. 365 [242 P. 906]; *People* v. *Glass*, 158 Cal. 650 [112 P. 281]; *People* v. *Peete, supra*; *People* v. *Vollmann*, 73 Cal.App.2d 769 [167 P.2d 545].) While it is admissible against the principal, it may be questioned whether some portions of it were likewise admissible against the claimed aider and abettor and whether or not the trial court should have limited its application in instructing the jury. (*People* v. *Anderson, supra*; *People* v. *Talbott*, 65 Cal. App.2d 654 [151 P.2d 317]; 14 Cal.Jur.2d pp. 226-227, §§ 41 and 42.)

The court told the jury that it should not consider any evidence against any particular defendant which the court indicated was not binding on that particular defendant and gave a complete instruction as to the purpose for which evidence of other offenses was admitted; that its reception was limited to the question of motive, intent, knowledge, plan, scheme, system or design, and not to consider it for any other purpose; and that where this was limited as to one defendant it should not be applied to others. This was followed by a general instruction that no particular defendant could be found guilty of any one of the counts unless the jury believed beyond a reasonable doubt that he had committed the offense charged therein. We see no prejudicial error in respect to the admission of the testimony about which appellants complain. This same conclusion must be reached in reference to certain exhibits received in evidence, over objections, bearing on the general method of filing and obtaining liquor license applications and the issuance of licenses thereon, one of which pertained to the Patterson transaction.

Further objection was made to the testimony in respect to the George Joe transaction, claiming it was incompetent because it did not show that an offense was actually committed; that it was too remote since it occurred about two years prior to the time Berry came to the San Diego district office, and that it was not admissible for impeachment purposes because Lyon previously told the grand jury, in the Patterson transaction, that it was the "first time he remembered he

took any interest in anything of that kind, and only did it because of Abbott." Appellant Lyon relies upon such cases as *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7] ; *People* v. *Glass, supra;* and *People* v. *Follette,* 74 Cal.App. 178 [240 P. 502]. ▮▮▮ Usually, the remoteness of the other claimed offense is a factual question depending on the facts of the individual case.

It was said in *People* v. *Stevens,* 78 Cal.App. 395, at pages 406-407 [248 P. 696] :

"A conspiracy may have a very small and very remote beginning . . . in conspiracy cases, 'it is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate facts at issue.' "

And quoting from an opinion in a civil case, said : " 'And in the admission of circumstantial evidence upon a charge of conspiracy great latitude is allowed. The jury should have before them, and are entitled to consider, every fact which has a bearing on and a tendency to prove the ultimate fact in issue which would assist them in arriving at a satisfactory conclusion, and it is no objection that the evidence may tend to prove many different transactions extending over any particular period of time, provided that all the facts proven have some bearing on a tendency to prove the ultimate fact in issue. The limits to which evidence of this kind may be admitted should be left to the discretion of the trial court, and its ruling should not be disturbed, when the evidence admitted tends, even remotely, to establish the ultimate fact of conspiracy.' "

This same evidence may not have been properly admitted under the decision of *People* v. *Follette, supra,* for impeachment of appellant Lyon's statement that it was the first time he *"remembered"* he took any interest in anything of that kind. However, his testimony before the grand jury also contained the statement that he took part in such a transaction "only . . . because of Abbott." The similar transaction consummated with George Joe might well have led the jury to believe that it was not entirely because of Abbott that he took part in the transaction with Patterson, and that it did bear on appellant's claim that the money received from Patterson was only for attorney's fees. It cannot be said as a

matter of law that the evidence was inadmissible in respect to the issues before the jury.

Additional claim is made that the court erroneously admitted extrajudicial statements made by appellant Lyon to the grand jury and to one of the investigators, and that the court erroneously allowed to be read a portion of Patterson's testimony taken before the grand jury. We see no merit to this claim. There were many inconsistent statements contained therein and they were plainly admissible. Counsel for appellant Lyon read a portion of Patterson's testimony and the trial court, for clarification, properly allowed all of his testimony on that subject to be read. No error appears in this respect.

Next, it is claimed that the prosecuting attorney was guilty of prejudicial misconduct in his cross-examination of appellant Lyon's character witnesses and in his argument to the jury. After testifying as to appellant Lyon's good reputation, several witnesses were cross-examined and asked generally, over strenuous objections, if they had heard anything about the "Philbrick Report" (Senate Journal of April 4, 1939), in which it was purportedly stated that Mr. Lyon's financial records had been gone over, and if they had heard that Senator Lyon received $9,250 from Artie Samish, liquor lobbyist, in California, and $4,500 from the turf club, when certain legislation was pending before the Legislature. Some witnesses admitted knowing generally about the report and others did not. Other questions of the same import were asked and the witnesses answered in the negative.

In *People* v. *Logan,* 41 Cal.2d 279, 287 [260 P.2d 20], it was said (quoting from *People* v. *McKenna,* 11 Cal.2d 327, 335-336 [79 P.2d 1065]):

"In the absence of a showing of bad faith it is always within the scope of legitimate cross-examination to ask a character witness whether he has heard the person whose reputation is under investigation accused of conduct inconsistent with the character attributed to him by the witness." (See also *People* v. *Gin Shue,* 58 Cal.App.2d 625 [137 P.2d 742]; *People* v. *Burwell,* 44 Cal.2d 16 [279 P.2d 744]; *People* v. *Sieber,* 201 Cal. 341, 356 [257 P. 64].)

Apparently the "Philbrick Report" was there available and there is no indication that such a report did not purportedly show these claimed facts. No bad faith is here indicated and no prejudicial error resulted.

Misconduct of the prosecuting attorney is claimed, not because of his comment on the failure of appellant Lyon to testify, but because the prosecutor called to the attention of the jury that appellant Lyon had failed to produce any evidence pertaining to his income tax return involving the $1,000, and certain other evidence which the prosecutor believed was available to him, for the purpose of contradicting the evidence produced by the prosecution. Error is claimed in this respect because it might well appear that such evidence was equally available to the State, citing *People* v. *Piazza,* 84 Cal.App. 58 [257 P. 592] ; and *People* v. *Harris,* 80 Cal.App. 328 [251 P. 823].

We have examined carefully the argument of the prosecuting attorney, particularly where objections were made thereto. In general, his argument was based upon some related evidence properly admitted or inference that might be reasonably deduced therefrom. We perceive no prejudicial misconduct in this respect.

Objections are now made to certain instructions given to the jury particularly in reference to the remarks of the trial judge to counsel for appellants, in the presence of the jury, and at other times, to the effect that ''This whole character evidence, both for the one side and the other, is all hearsay, and that is why it is admissible.'' This, no doubt, was not a correct statement of the law. (*People* v. *Jones,* 42 Cal.2d 219, 223 [266 P.2d 38].) In other instructions and statements to the jury this statement was clarified and the court there indicated that although such evidence is ''built on hearsay'' it may be sufficient, standing alone, to create a reasonable doubt of guilt. We do not seriously believe that prejudicial error resulted.

Appellant Lyon offered certain instructions to the effect that if several independent conspiracies were proved as to Count I, he was entitled to an acquittal; that no conviction could be had on the extrajudicial admissions of the defendant without independent proof of the corpus delicti; that evidence of similar offenses are to be received with ''extreme caution'' and that acts and declarations of confederates are never competent against a party except insofar as they are steps in furtherance of a purpose common to him or them. We have carefully examined the instructions, both given and refused. We are satisfied the refused instructions were sufficiently covered by other instructions given and that the

instructions given, when considered as a whole, were sufficient and not prejudicially erroneous.

The trial court did not prejudicially err in overruling the demurrer to the indictment, denying the motion to set aside the indictment, denying the motion for separate trial, denying motions to dismiss the indictment as well as the motion in arrest of judgment, and denying a new trial, not only as to appellant Lyon but also as to the other appellants. We believe this sufficiently disposes of the main contentions raised by appellant Lyon set forth in a most exhaustive and well-prepared brief containing approximately 335 printed pages.

Appellant Trapani, in his brief, emphasizes the claim that only a single conspiracy was alleged, and that the evidence, at best, showed a conglomeration of distinct and separate offenses. We believe this claim was sufficiently answered in reference to that raised by appellant Lyon. Although appellant Trapani claims otherwise, the evidence was sufficient to support his conviction on the counts indicated.

Appellant Bennett, in his brief, claims that the evidence was insufficient to support his conviction on Count XI. Without restating the evidence, the testimony of Gillenberg and the other corroborating evidence, if believed by the jury, sufficiently supports the verdict on this count. (*People* v. *Bennett*, 132 Cal.App.2d 569 [282 P.2d 590].)

Before the trial certain defendants moved for a change of venue to another county based upon certain affidavits in support of the motion upon the claim that public opinion created by the press prejudged appellant's guilt and that therefore the trial of the appellant was but a legal gesture to register a verdict already directed by the public press and the feeling thereby created. Appellant Bennett claims error in denying the motion for change of venue and the trial judge's failure to have his claimed disqualification determined under section 170 of the Code of Civil Procedure before proceeding further with the trial. The facts which appellant Bennett claims support the motion for change of venue are predicated mainly on copies of newspaper articles in which the pictures of defendants and appellants were shown and in which it was alleged that they were charged with the particular offenses indicated and that certain witnesses had testified before the grand jury that a "Brutal Syndicate Rules San Diego Licenses"; that certain witnesses appearing before the grand jury testified that they were told they had to pay from $4,000 to $7,000 to obtain new on-sale general liquor

licenses; that Al Bennett "declined to testify at a State Board of Equalization hearing"; that "new Federal action against local liquor license scandals was indicated"; and other articles to this effect. This evidence, in conjunction with the showing made by appellants, as related in *People* v. *Bennett, supra,* p. 579, was fully considered by the trial court and the motion was denied. The additional evidence offered would not materially alter the facts and conclusions reached in that case. It was there said (at p. 580) that:

"The court has a wide discretion in passing on such a motion and the record does not indicate that this discretion was not properly exercised. Unusual freedom was allowed in examining prospective jurors, including their reaction to any such publicity, and while considerable time was devoted to selecting a jury no unusual difficulty in selecting one appears. The defendants did not exhaust their peremptory challenges and at the conclusion of that proceeding appellants' counsel expressed himself as satisfied with the jury. . . . While there was naturally a large amount of publicity about that time in connection with several matters of this general nature, there was no unusual publicity in connection with this particular case, and the record fails to reveal any abuse of discretion in this respect."

In the instant case the trial court offered appellants additional peremptory challenges which they refused. The jury was thoroughly examined in respect to the general publicity of the related cases and subsequently the jury was accepted.

The question is then raised in respect to the failure of the court to comply with section 170 of the Code of Civil Procedure in respect to his own claimed disqualifications. This claim of general disqualification is predicated upon the facts related in *People* v. *Bennett, supra,* page 578, in reference to change of venue and some additional showing which included certain remarks of the trial judge in denying a motion for new trial in the former case of *People* v. *Bennett, supra,* at which time the judge said he had read over the testimony of the witnesses who had testified in that case; that he believed them and the jury must have believed them also; that these remarks were widely publicized in the newspapers; and accordingly appellants could not have a fair trial under these circumstances where many of the same witnesses testified at the present trial, particularly in reference to appellant Bennett. Apparently it is appellant's contention that under the showing made and facts related in *People* v. *Bennett,*

*supra,* as to the grounds of change of venue, no superior court judge in San Diego County was qualified to try the instant case; that the question of their disqualification should have been determined under section 170 of the Code of Civil Procedure by a judge other than one of the superior court judges of San Diego County, or that the motion for change of venue should have been granted.

In *In re Harrington,* 87 Cal.App.2d 831 [197 P.2d 783], it was held that a judge whose disqualification is challenged by an affidavit filed under Code of Civil Procedure section 170, is without power to pass upon his own disqualification, and he is without jurisdiction to hear the cause unless and until, after a hearing by another judge in the manner prescribed by the code, he has been found not to be disqualified. This is followed by a statement that a judge should not be disqualified lightly or upon frivolous allegations or mere conclusions, and that the section requires the affidavit of bias and prejudice to set forth "the fact or facts constituting the ground of the disqualification of such [trial] judge." It has been held that where such affidavit is based upon "frivolous" grounds and contains no facts sufficient to constitute prejudice, or if it contains nothing but conclusions the judge may be justified in disregarding it. (*People* v. *Hooper,* 16 Cal.App.2d 704 [61 P.2d 370]; *People* v. *Sweet,* 19 Cal.App.2d 392 [65 P.2d 899]; *Ephraim* v. *Superior Court,* 42 Cal.App.2d 578 [109 P.2d 378].)

In *Bompensiero* v. *Superior Court, supra,* similar action was taken by the trial judge based upon the showing there made. The Supreme Court sustained the trial judge and held that the showing made did not constitute sufficient basis for disqualification. We do not believe that the additional showing here made added any facts of greater import. The denial of the motion for change of venue and the refusal of the trial judge to submit the claim of disqualification for consideration under section 170 of the Code of Civil Procedure were authorized.

Finally, appellant Bennett, in addition to points heretofore discussed, raised the claim that the trial court erroneously precluded him from entering additional and special pleas of former conviction and once in jeopardy as to Count XI, claiming that he was previously convicted of the offense charged, upon the same evidence, in *People* v. *Bennett, supra,* and that he has been once in jeopardy on that charge by virtue of the judgment rendered in that case on September

1, 1954. A full and formal offer of proof was made and instructions to the jury were requested on the subject. The trial court refused the request and the proffered instructions, apparently on the ground that there was no evidence to support the pleas or the instructions. Appellant Bennett claims the inherent right to enter the pleas and to have the jury pass upon the questions as a matter of fact, citing such cases as *Michener* v. *United States,* 157 F.2d 616; and *People* v. *Keyes,* 103 Cal.App. 624, 632 [284 P. 1096].

The complaint, epitomized, is that appellant Bennett was previously convicted of the crime of conspiring with certain other named defendants to commit the crime of asking or receiving bribes by a public officer in relation to the ($2,500 Gillenberg) transaction (see *People* v. *Bennett, supra*) ; that he was charged with a substantive crime, with others, in the instant proceeding after having been previously convicted of conspiracy to commit that crime; that he previously suffered a conviction of the offense charged, upon the same evidence; and accordingly he was once in jeopardy.

It is well established that under proper circumstances a trial judge may refuse to enter such a plea. (*People* v. *Hinshaw,* 194 Cal. 1, 24 [227 P. 156] ; *People* v. *Baillie,* 133 Cal.App. 508, 513 [24 P.2d 528].)

The determining question here presented is whether there was *any* competent evidence to support such a finding by the jury before appellant Bennett could claim that he was prejudiced by the actions of the trial court. In *People* v. *MacMullen,* 218 Cal. 655, 656 [24 P.2d 793], our Supreme Court ·held that, upon the great weight of authority, the acquittal of a defendant of the crime of conspiracy to commit a crime is not a bar to a subsequent prosecution of said defendant for the commission of the crime itself, even though said crime is alleged in the conspiracy indictment as the sole overt act committed in furtherance of the conspiracy. Accordingly, it cannot be said that the conviction of the crime of conspiracy, as alleged in the instant case, would constitute a bar to the prosecution for the main offense charged. (*People* v. *Griffin,* 98 Cal.App.2d 1, 54 [219 P.2d 519] ; *People* v. *Clensey,* 97 Cal.App. 71 [274 P. 1018] ; *People* v. *Chait,* 69 Cal.App.2d 503, 513 [159 P.2d 445] ; *People* v. *Greer,* 30 Cal.2d 589 [184 P.2d 512] ; *People* v. *Havel,* 134 Cal.App.2d 213 [285 P.2d 317].)

Since there was no evidence offered supporting

the pleas proposed or the proffered instructions thereon, no prejudicial error resulted.

Judgments and orders affirmed.

Barnard, P. J., and Mussell, J., concurred.

Petitions for a rehearing were denied October 6, 1955, and the petitions of Appellants Charles Lyon and Al W. Bennett for a hearing by the Supreme Court were denied October 19, 1955.